**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 12 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

JAMES T. FISHER,

      Petitioner-Appellant/
      Cross-Appellee,

v.

GARY E. GIBSON, Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee/
      Cross-Appellant.

Nos. 99-6433
99-6444

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 93-CIV-1888-L)**

---

Patrick J. Ehlers, Jr., Assistant Federal Public Defender, Death Penalty Federal
Habeas Corpus Division, Oklahoma City, Oklahoma, for Petitioner-
Appellant/Cross-Appellee.

Robert Whittaker, Assistant Attorney General (W. A. Drew Edmondson, Attorney
General of Oklahoma, with him on the briefs), Oklahoma City, Oklahoma, for
Respondent-Appellee/Cross-Appellant.

---

Before **SEYMOUR**, **KELLY** and **MURPHY**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

James T. Fisher was convicted of first degree murder in Oklahoma County

District Court and sentenced to death in September 1983. Mr. Fisher filed a

petition for habeas corpus relief under 28 U.S.C. § 2254, which the federal

district court granted as to the sentencing phase of his trial. Mr. Fisher and the

state of Oklahoma both appeal. For the reasons stated below, we reverse and

grant conditional habeas relief as to the guilt phase of the trial. Consequently, the

appeal of the state regarding reversal of the death sentence is moot.

**I**

Police found the body of Terry Neal in his apartment on December 12,

1982. After interviewing people in an area of downtown Oklahoma City that Mr.

Neal was known to frequent, police located and questioned Fadjo Johnson, who

was a juvenile at the time.[1] Mr. Johnson was initially charged with first degree

murder in the death of Mr. Neal, but the charges were dropped and he was named

a material witness instead. Rec. vol. 2, doc. 191, Attach. 1.[2] Based largely on

information from Mr. Johnson, the Oklahoma police identified Mr. Fisher as a

---

[1] Police apparently interviewed witnesses, whom they did not name, who stated
they had seen someone matching Mr. Johnson's description and another man with
Mr. Neal the evening before the murder.

[2] Citations to the three-volume record in the federal habeas corpus proceeding will
be shown as the record (rec.) and the volume (vol.). Citations to the state trial
transcript will be to the trial transcript (trial tr.) and the volume (vol.).

suspect. Mr. Fisher was arrested for Mr. Neal's murder by the police in Buffalo, New York, on January 10, 1983, and extradited to Oklahoma to stand trial on the charge of first degree murder. He requested the appointment of counsel, and the court appointed E. Melvin Porter to represent him.

At trial, the state presented Mr. Johnson as the primary witness for its case against Mr. Fisher. Mr. Johnson testified that he and Mr. Fisher met for the first time on the evening of December 11 in an area of downtown Oklahoma City known for homosexual prostitution. Mr. Johnson further testified that the victim, Mr. Neal, approached him and Mr. Fisher in a car and took them to Mr. Neal's apartment, and that Mr. Fisher and Mr. Neal had sex while he watched television. After this, Mr. Johnson testified, Mr. Fisher hit Mr. Neal on the head with a bottle of wine and stabbed Mr. Neal in the neck several times with the broken end of the bottle. Then, the testimony continued, Mr. Fisher ordered Mr. Johnson to pick up Mr. Neal's television and the two drove Mr. Neal's car to downtown Oklahoma City and sold the television. Mr. Johnson further testified that Mr. Fisher dropped him off several blocks from his home after asking directions to Tulsa.

Detective Dove from the Buffalo Police Department was the only other prosecution witness to relate evidence directly against Mr. Fisher. Detective Dove testified that at the time of Mr. Fisher's arrest, Mr. Fisher made an oral statement that he had hit someone named Terry over the head with a wine bottle but had not killed him, and that the other person he was with, whose name he

-3-

could not remember, had not killed the man either.[3] The state presented no physical evidence that linked Mr. Fisher to the crime despite having gathered Mr. Fisher's clothing and fingerprints, and fingerprints from Mr. Neal's apartment and automobile. The defense Mr. Porter presented consisted solely of Mr. Fisher's direct testimony. Mr. Porter did not present any other witnesses or evidence and did not make an opening or a closing statement at the guilt phase of the trial. He did cross-examine most of the state's witnesses and raised a number of objections during trial.

The jury returned a guilty verdict. Once the verdict was delivered, the trial court proceeded immediately to the sentencing phase of the trial. The prosecution presented a second-stage case that consisted of a brief opening statement, incorporation of the evidence from the first-stage proceedings, and a lengthy closing argument. The state urged the jury to find two aggravating factors: the

---

[3] Detective Dove testified that at the time of his arrest Mr. Fisher stated:
> Seeing you've got so much evidence, I was in Oklahoma and I used to do something to try and make money. I'd just pick up homos. I met this young dude, 14 or 15 years old. He was out doing the same thing I was. This one guy I'm telling you about, he didn't kill the man, but he was with me when it happened. I had a bottle and the only thing I did was bust it over his head. I didn't trust this young dude when I hit this guy upside the head with the bottle and I told him not to say anything.

Trial Tr. at 362. Detective Dove also testified that Mr. Fisher stated the name of the person he hit over the head was, "Terry, I think," *id.* at 363, and that the incident occurred in Oklahoma City. Mr. Fisher stated, "It happened outside. This young dude was talking crazy. He wanted to go back to the place and take off his TV. The young dude searched him and he didn't have any money." *Id.*

crime was especially heinous, atrocious, or cruel; and the defendant is a continuing threat to society.

Defense counsel, for the penalty phase, chose to waive an opening statement, rested without presenting any evidence, and waived closing arguments. He made one objection during the prosecution's closing statement, which the judge overruled. The jury found the presence of the two aggravating factors and recommended the death sentence, which the judge imposed in a sentencing hearing on September 20, 1984.

Mr. Fisher raised ineffective assistance of counsel on direct appeal. His conviction and sentence were originally affirmed by the Oklahoma Criminal Court of Appeals. *Fisher v. State*, 736 P.2d 1003 (Okla. Crim. App. 1987). Although the court granted Mr. Fisher's petition for a rehearing "to further clarify" whether he was denied effective assistance of counsel at the second stage of the trial, it denied the claim on the merits without an evidentiary hearing. *Fisher v. State*, 739 P.2d 523, 524 (Okla. Crim. App. 1987). In so doing, the court stated it was "deeply disturbed by defense counsel's lack of participation and advocacy during the sentencing stage" and conceded that Mr. Fisher "presents a close case," but nevertheless concluded Mr. Fisher had failed to establish prejudice. *Id.* at 525. The United States Supreme Court denied certiorari. *Fisher v. Oklahoma*, 486 U.S. 1061 (1988). Mr. Fisher applied for state post-conviction relief, and requested an evidentiary hearing on the matters raised in his

application. The state district court and the Oklahoma Court of Criminal Appeals affirmed his conviction and sentence without holding an evidentiary hearing. *Fisher v. State*, No. PC-89-42 (Okla. Co. Dist. Ct. Dec. 20, 1988); *Fisher v. State*, 845 P.2d 1272 (Okla. Crim. App. 1992), *cert. denied*, 509 U.S. 3014 (1993).

Mr. Fisher filed a petition for a federal writ of habeas corpus in 1993. The petition asserted fourteen grounds for relief, including ineffective assistance of counsel at both the guilt and sentencing phases of trial, and requested an evidentiary hearing. The guilt-phase ineffective-assistance claim alleged the following errors: 1) failure to conduct an adequate investigation; 2) failure to pursue mental health issues; 3) failure to rehabilitate jurors excused for cause; 4) failure to object to prosecutor misconduct; 5) improper direct examination of his client by eliciting evidence of other crimes and dwelling on negative aspects of Mr. Fisher's history; 6) failure to object to jury instructions; and 7) failure to present a closing argument. Mr. Fisher also argued that the cumulative effect of Mr. Porter's errors deprived him of effective assistance of counsel. The ineffective-assistance claim as to the penalty phase alleged that Mr. Porter had completely abrogated his duty as counsel by failing to investigate mitigating evidence, failing to present any mitigating evidence, and waiving both opening and closing arguments.

The district court granted Mr. Fisher's request for an evidentiary hearing as to the ineffective-assistance and mental health claims. In a subsequent order, the

-6-

court held that Mr. Fisher had received ineffective assistance of counsel in the sentencing phase of his trial, and granted conditional habeas relief as to Mr. Fisher's sentence of death. Specifically, the court determined that counsel was constitutionally deficient in the second stage because he "failed to conduct an adequate pre-trial investigation into the readily available mitigating evidence or take any action to develop mitigating evidence," rec. vol. 2, doc. 215 at 19, and "failed to subject the prosecution's case to adversarial testing," *id.* at 21. The court pointed out that Mr. Porter had said only nine words during the entire sentencing proceeding:

> Of the nine words he uttered, four were the equivalent of judicial pleasantries and did nothing to advocate Petitioner's case. The other five words formed an ill-founded, unsupported and ultimately rejected objection to one portion of the prosecutor's closing argument. As with the other four words, the five word objection did nothing to advocate Petitioner's case. Finally, Petitioner's trial counsel forwent the opportunity to argue the existence of mitigating evidence or its weight when compared to the aggravating circumstances and to beg for Petitioner's life when he waived closing argument.

*Id.* at 20. The court concluded it lacked confidence in the second stage verdict and granted relief as to the sentence of death. *Id.*

The district court found no merit to any of Mr. Fisher's other claims. As to the guilt-phase ineffectiveness claim, the court found that while counsel might have been deficient with respect to some of the grounds alleged, Mr. Fisher failed to demonstrate prejudice from any alleged error.

-7-

Mr. Fisher appeals the denial of his guilt-phase ineffective-assistance claim. He also appeals the denial of his *Brady* claim asserted with regard to summaries of conflicting police interviews of a prosecution witness that the state failed to disclose. In its cross-appeal, the state contends the district court erred in granting relief with respect to the death sentence.

For the reasons stated below, we hold Mr. Fisher was not provided effective assistance of counsel in the guilt phase of his trial, and we therefore reverse the district court's denial of habeas relief as to the guilt phase. Because Mr. Fisher is thus entitled to a new trial, we find it unnecessary to reach the *Brady* issue or the penalty phase ineffective-assistance claim.

**II**

**A.**

We must first determine the standards applicable to our review. Mr. Fisher filed his habeas petition on October 26, 1993, before the effective date of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), so pre-AEDPA law and standards of review govern the merits of the petition. *Lindh v. Murphy*, 521 U.S. 320 (1997). Ineffective assistance of counsel claims present mixed questions of law and fact and are therefore subject to de novo review. *Strickland v. Washington*, 466 U.S. 668, 698 (1984). We nevertheless review factual findings made by the district court in reaching its disposition of the ineffectiveness claims

for clear error, *id.,* and we presume correct state court findings with respect to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators," *Williamson v. Ward*, 110 F.3d 1508, 1513 (10th Cir. 1997) (quotations and cites omitted).

The district court granted a Certificate of Probable Cause (CPC) as to the issues appealed here. Because Mr. Fisher filed his appeal on November 1, 1999, after the effective date of AEDPA, AEDPA governs the right to appeal, *see Moore v. Marr*, 254 F.3d 1235, 1238-39 (10th Cir. 2001), and Mr. Fisher is required to have a Certificate of Appealability (COA) rather than a CPC. 28 U.S.C. § 2253(c)(2). Since the standards governing the grant of a COA and a CPC are the same, *see Nyugen v. Reynolds*, 131 F.3d 1340, 1345 (10th Cir. 1997), the CPC issued by the district court serves as a COA here.

## B.

The Sixth Amendment right to counsel "is the right to the *effective* assistance of counsel." *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)) (emphasis added). This right is driven by the rationale that the effective assistance of counsel is necessary to safeguard the right to a fair trial: "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *United States v. Cronic*, 466 U.S. 648, 654 n.8 (1984) (quoting *Powell v. Alabama*, 287

U.S. 45, 68-69 (1932)); *see also Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986) ("'Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have.'") (quoting Walter V. Schaefer, *Federalism & State Criminal Procedure*, 70 HARV. L. REV. 1, 8 (1956)).

The overarching test for effective assistance of counsel is whether the defendant's attorney subjected the prosecution's case to meaningful adversarial testing. *Strickland*, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.").

> The right to effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted – even if defense counsel may have made demonstrable errors – the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.

*Cronic*, 466 U.S. at 656-57 (footnotes omitted). The premise of an adversarial system in which the defendant has an effective advocate for his side "underlies and gives meaning to the Sixth Amendment. It is meant to ensure fairness in the adversary criminal process. Unless the accused receives effective assistance of counsel, a serious risk of injustice infects the trial itself." *Id.* at 655-56 (footnotes, internal quotations and citations omitted).

In order to make the adversarial process meaningful, counsel has a duty to investigate all reasonable lines of defense. *Nguyen*, 131 F.3d at 1347; *see also Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). This duty is "strictly observed in capital cases." *Nguyen*, 131 F.3d at 1347. If no viable defense theory is available, the Sixth Amendment still requires that counsel "hold the prosecution to its heavy burden of proof beyond a reasonable doubt." *Cronic*, 466 U.S. at 657 n.19.

Effective assistance also requires that an attorney adhere to his duty of undivided loyalty to his client. *Strickland*, 466 U.S. at 692. This duty includes acting as a meaningful adversary vis-a-vis the state.

> The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client . . . . And nowhere is this service more honorable than in case of appointment to represent an accused too poor to hire a lawyer, even though the accused may be a member of an unpopular or hated group, or may be charged with an offense which is particularly abhorrent.

*Osborn v. Shillinger*, 861 F.2d 612, 624-25 (10th Cir. 1988) (quoting *Von Moltke v. Gillies*, 332 U.S. 708, 725-26 (1948)). Thus the duty of loyalty is violated not merely when counsel represents clients who have conflicting interests, but also when counsel acts more for the benefit of, and with more apparent sympathy toward, the prosecution than the client he is defending. *See id.* at 625 (quoting *Cronic*, 466 U.S. at 666) ("an attorney who adopts and acts on a belief that his

-11-

client should be convicted 'fail[s] to function in any meaningful sense as the Government's adversary.'").

In *Strickland*, the Supreme Court articulated a two-pronged test for determining whether the assistance of counsel to a criminal defendant has fallen below constitutional standards:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. We turn to the application of this standard to the facts of this case.

## C.

As we have noted, Mr. Fisher raised seven claims of counsel error in his habeas petition as grounds for his claim of ineffective assistance during the guilt phase of his trial. Mr. Fisher also contended that the cumulative effect of Mr. Porter's errors deprived him of effective assistance of counsel. The district court found that while counsel might have been deficient in his investigation of the case, rec. vol. 2, doc. 215 at 7-9, and his pursuit of mental health issues, *id.* at 10, Mr. Fisher failed to demonstrate prejudice as to any of the claimed errors. The

-12-

court therefore denied the guilt-phase ineffectiveness claim on all grounds presented. *Id.* at 6-16.

As an initial matter, we address the state's contention that Mr. Fisher raises on appeal two new grounds for ineffective assistance that are not properly before this court. The state claims Mr. Fisher failed to argue below that the manner in which counsel cross-examined Mr. Johnson constituted error, Aplee. Br. at 9, and that counsel erred by asking Detective Dove about blood-stained clothing, *id.* at 12, constituted ineffectiveness.

We disagree that these grounds for ineffective assistance are presented for the first time on appeal. Mr. Fisher asserts these two contentions under the subheading, "Mr. Fisher suffered actual prejudice as a result of trial counsel's *total failure* to advocate on his behalf." Aplt. Br. at 15 (emphasis added). Mr. Fisher thus presents these two instances not as distinct grounds of ineffective assistance of counsel, but as examples that support the grounds of ineffectiveness Mr. Fisher asserted in his habeas petition. Moreover, while it is true that a petitioner must "identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment," *Strickland*, 466 U.S. at 690, Mr. Fisher did identify these two acts in his amended habeas petition or his supplemental habeas petition as support for one or more grounds of

ineffectiveness asserted there.[4]  The specific instances of alleged error Mr. Fisher

discussed in his brief are therefore properly before this court.

### *Deficient Performance*

To show ineffective assistance of counsel, Mr. Fisher must first show that

counsel's representation "fell below an objective standard of reasonableness."

*Strickland*, 466 U.S. at 688.   We have defined the reasonableness standard as

"the exercise of the skill, judgment, and diligence of a reasonable competent

defense attorney."  *Osborn*, 861 F.3d at 625 (citations and quotes omitted).

Reasonably professional performance includes a duty by counsel to investigate all

---

[4] Mr. Fisher asserted as error the manner in which Mr. Porter cross-examined Mr. Johnson in support of his claim of cumulative ineffectiveness.  *See* rec. vol. 1, doc. 124 at 16 (criticizing counsel for the sympathetic, nonconfrontational way in which he questioned Mr. Johnson); *see also id.* at 7 (stating Mr. Porter did not cross-examine Mr. Johnson about his prior inconsistent statements to police).  Mr. Fisher also discussed counsel's failure to challenge Mr. Johnson's credibility to support his claim that counsel erred by not presenting a closing argument, *see id.* at 29-31 (arguing counsel was ineffective for failing to present a closing because he could have argued, among other things, that Mr. Johnson was not a credible witness); and counsel's failure to obtain and use evidence of the murder charge filed against Mr. Johnson in support of his inadequate investigation claim, *see id.* vol. 2, doc. 191 at 1-5 (arguing counsel's lack of investigation resulted in his failure to obtain evidence of murder charge against Mr. Johnson and to challenge his credibility).

With respect to counsel's eliciting detrimental testimony from Detective Dove, Mr. Fisher discussed this matter in support of his general claim of ineffectiveness.  *See id.* vol. 1, doc. 124 at 16 (criticizing counsel for the statements elicited from Detective Dove about bloodstained clothing); *id.* at 11-12 (criticizing trial counsel for eliciting "bloody clothes" testimony from Dove not raised on direct, and then failing to ask about state's test results).

lines of defense or make reasonable determinations that such investigation is unnecessary. *Strickland*, 466 U.S. at 691. In reviewing a claim of ineffectiveness we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and avoid judging counsel's performance using the "distorting" benefit of hindsight. *Id.* at 690.

**a.** *Investigation*

Mr. Fisher first asserts that his attorney did not adequately investigate his case. Our review of the trial record, in conjunction with Mr. Porter's habeas testimony in an affidavit and at the evidentiary hearing, convinces us beyond question that Mr. Porter's representation in this respect was not objectively reasonable.

At the time he was appointed to represent Mr. Fisher, Mr. Porter also had a separate career as a state senator. Rec. vol. 2, doc. 141 at 1-2. Mr. Porter stated in an affidavit that during this time he maintained an active criminal practice but tried all his cases between September and December because of his legislative obligations, and that his trial schedule was often so heavy he sometimes would finish one case in the morning and begin trying a new case in the afternoon while the jury was still deliberating. *Id.* He also stated he probably had at least twenty-five cases on the September 1983 jury docket, and he recalled he tried another capital murder case the week before Mr. Fisher's trial began. *Id.*

-15-

The district court noted Mr. Porter failed to view the crime scene and filed no discovery motions. *Id.* doc. 215 at 7. Mr. Porter also failed to discover prior to trial that the state would present testimony from Buffalo Police Detective Dove, including testimony that Mr. Fisher had made statements at the time of his arrest in which he admitted assaulting someone named Terry at some point but denied the murder.[5] In addition Mr. Porter apparently failed to review the transcript of Mr. Fisher's extradition hearing, which reveals that parts of Mr. Fisher's statement to the police at the time of his arrest are exculpatory: Detective Dove testified at the extradition hearing that while Mr. Fisher stated he remembered meeting someone named Terry and hitting him over the head with a bottle, he also remembered this meeting occurred in September or October 1982, rather than December 1982 when the murder occurred, and that the Terry he met was black, while the victim was white. Rec. vol. 2, doc. 219, Extradition Hr'g Tr. at 29-31; *see also id.* at 7, 20, 23 (extradition testimony of Mr. Fisher). This could have been used to counter the otherwise inculpatory nature of the statement

---

[5] At trial, Mr. Porter claimed he did not know before the trial began that the state would present testimony from Detective Dove about Mr. Fisher's statements at the time of his arrest, and objected to the testimony for the state's failure to provide notice. Trial Tr. vol. III at 374. In response, the state told the court it had notified Mr. Porter after the preliminary hearing that he could inspect a videotape taken by Buffalo police (that was ruled inadmissible) and interview the officers who would testify, yet Mr. Porter failed to avail himself of this opportunity. *Id.* at 376-77. On this basis the court ruled Mr. Porter had had adequate notice of Dove's testimony, including Mr. Fisher's reported statements. *Id.* at 377.

as presented by the prosecution, but was not. It is also unclear whether Mr. Porter reviewed the police reports related to Mr. Fisher's case.[6]

In addition, the nature of the trial itself indicates a singular lack of preparation on Mr. Porter's part. The trial transcript reveals that throughout most of Mr. Porter's examination of witnesses, including his own client, he had no idea what answers he would receive to his questions and was not pursuing any particular strategy of defense. Rather, Mr. Porter was conducting an admittedly uninformed and therefore highly reckless "investigation" during trial. Indeed the examination of Mr. Fisher and the other witnesses read more like first-time interviews conducted during discovery than the presentation of a defense at a capital murder trial. As a result, Mr. Porter elicited testimony from his client and the state's witnesses that, far from assisting in Mr. Fisher's defense, was highly detrimental to it.

For example, the state presented Detective Dove, the officer who arrested Mr. Fisher in Buffalo, as a witness in its case in chief. On direct examination, Detective Dove essentially related the circumstances of arrest and testified that Mr. Fisher orally confessed to assault at the time of his arrest. Trial Tr. vol. III

---

[6] Mr. Porter testified in the evidentiary hearing that he did read the police reports. Rec. vol. 3 at 20. However, not only did he seem to have a very faint recollection generally of what he did to prepare for the case, he also stated later in the same hearing that he did not remember seeing the police reports and he believed he was not allowed access to the reports at the time. *Id.* at 59-61.

at 358-63. Detective Dove made no mention of any forensic evidence gathered from Mr. Fisher at that time, not even fingerprints. *Id.* Nevertheless, when Mr. Porter cross-examined Detective Dove, he proceeded as follows:

Q: Did you take any fingerprints of this defendant while you had him in the custody of the Buffalo Police Department?
A: I didn't personally, but they were taken.
. . . .
Q: Okay. Did you take any property that belonged to the defendant and send [sic] back here?
A: Yes, sir.
Q: What did you take?
A: All of his clothes.
. . . .
Q: Did you examine these clothes?
A: Yes, sir.
*Q: Did you see any bloodstains on them?*
A: Yes, sir.
Q: How did you know they were bloodstains?
A: They appeared to be bloodstains to me, from my experience.
Q: So you took *what appeared to be bloodstains on some clothes* and mailed them back here to –
A: No, we took the clothes and mailed them back.
Q: Yeah, you took *the clothes with the bloodstains on them* —
A: Yes, sir.
Q: — and you mailed them back here to Oklahoma City.
A: That's correct
*Q: But now you're a police officer with 37 years of experience and you've been with homicide for a number of years, 20-some years, and you saw clothes that purportedly carried blood on them, that in your opinion was bloodstains; is that right?*
*A: That's right.*
*Q: And where were the bloodstains on the clothes?*
*A: On the jacket. There were bloodstains down the front and inside the pocket.*
Q: Okay.

*Id.* at 366-68 (emphasis added). This exchange reveals what Mr. Porter later admitted: he in effect was attempting to conduct his investigation at trial.[7] Moreover, Mr. Porter compounded the error of his reckless decision. Prior to Detective Dove's testimony before the jury, Mr. Porter had cross-examined him *in camera*, where he could have asked these questions but failed to do so. *Id.* at 339-58. He also failed to pursue the results of state tests on the clothing that might have established that the bloodstains did not match the victim's blood, or that the stains were not in fact blood. Finally, he did not attempt at any point to mitigate the impact of the bloodstain information he put before the jury by pointing out the state's failure to link it to the murder.

Mr. Porter similarly elicited detrimental testimony from Officer Andrews of the Oklahoma City Police Department on cross-examination about evidence of a bloody fingerprint found in the victim's car. Trial Tr. vol. II at 273-74. Remarkably, Mr. Porter had just successfully excluded this very testimony on direct with a hearsay objection. *Id.* at 272. Mr. Porter again failed to do anything to mitigate the impact of the fingerprint testimony or to use it to his client's advantage by pointing out that the state produced no evidence showing the fingerprint was that of Mr. Fisher. *Id.* at 273-87.

---

[7] Mr. Porter stated at the evidentiary hearing he did not know anything about bloody clothing before he asked the questions, and that in his cross-examination of Detective Dove he was attempting to learn what the police found at the time of arrest. Rec. vol. 3 at 36-39.

Mr. Porter's unfamiliarity with the case extended to his client's version of events and theory of defense. To the extent any defense theory was presented at trial, it consisted solely of an alibi ineptly advanced by Mr. Fisher on the stand. Not only was Mr. Porter unprepared to help Mr. Fisher offer the theory in any coherent or credible way, Mr. Porter's questions essentially undermined this line of defense due in part to his failure to conduct any pretrial investigation:

> Q: Okay. Were you in Oklahoma City on December the 12[th], 1982?
> A: No, I wasn't.
> Q: Where were you?
> A: In Coffeyville, Kansas.
> Q: When did you go to Coffeyville?
> A: I can't recall what day it was, but –
> Q: What month did you go to Coffeyville?
> A: In December.
> Q: Where did you go to Coffeyville from?
> A: From – if I can recall, from Oklahoma City.
> Q: When did you leave Oklahoma City to go to Coffeyville?
> A: I can't recall that, sir.
> Q: Was that in December?
> A; Yes.
> *Q: So you were in Oklahoma in December of 1982?*
> A: Yeah.
> Q: And you left here and went to Coffeyville.
> A: Right.
> Q: What day of the month in December did you leave?
> A: I can't tell you what date of the month in December I left, *but I had on this affidavit of [sic] being in Coffeyville, Kansas.*
> . . . .
> Q: How did you get from [sic] Coffeyville from Oklahoma City?
> A: Well, I was on a bus.
> Q: And where did you catch the bus?
> A: Right there at the bus depot, downtown. Across the street –
> *Q: Oh, here in Oklahoma City?*
> A: Yeah.
> Q: So you caught a bus to go from Oklahoma City to Coffeyville.

-20-

A:  Yeah.
Q:  *Have you got your bus ticket?*
A:  *I do have a stub.*
Q:  *Where is the stub?*
A:  *It's not here.  My lawyer back home has the stub.  It – it could be sent down, because it's still there.*

Trial Tr. vol. III at 429-31 (emphasis added).

Mr. Porter continued to question his client about the number of days he was in Oklahoma City, where else he had been in Oklahoma, how long he spent in Kansas, where he stayed there, and when he arrived home in Buffalo.  *Id.* at 431-33.  Mr. Fisher testified he could not remember the dates or the exact number of days he was in each of those places, although he testified he stayed at a Salvation Army in Coffeyville, Kansas.  *Id.*  The affidavit Mr. Fisher mentioned in his testimony refers to a letter from the Salvation Army in Coffeyville stating that James Fisher, using the alias Henry Davis, stayed there on December 12, 1982, the night of the crime in question.  Mr. Fisher's extradition lawyer apparently had no trouble obtaining and presenting this letter to the court in that proceeding.  Rec. vol. 2, doc. 219, Extradition Hr'g Tr. at 17-18.  Regardless of the admissibility of the letter at trial, it provided information that Mr. Porter could have used in defending his client.

The lack of preparation revealed by these illustrative exchanges indicates an objectively unreasonable failure to investigate.  Counsel has a duty to investigate all reasonable lines of defense, or make reasonable determinations that

such investigation is not necessary. *Strickland*, 466 U.S. at 691. A decision not to investigate cannot be deemed reasonable if it is uninformed. *Id.* Mr. Porter's decision not to undertake substantial pretrial investigation and instead to "investigate" the case *during* the trial was not only uninformed, it was patently unreasonable.

Nor can the actions described above be considered part of a general trial strategy of pointing to holes in the state's evidence to create a reasonable doubt. Mr. Porter could have pursued such a strategy: he elicited testimony about certain physical aspects of the crime and his client that the state itself never introduced or used to link his client to the crime. Mr. Porter could have argued to the jury it should infer from these circumstances that the state had no physical evidence against Mr. Fisher, or even that its evidence exonerated him. However, "the mere incantation of 'strategy' does not insulate attorney behavior from review." *Breechen v. Reynolds*, 41 F.3d 1343, 1369 (10th Cir. 1994) (internal quotation omitted). Here it is evident that counsel did not have a strategy of pointing to holes in the evidence or trying to create a reasonable doubt in jurors' minds. To the contrary, it is obvious that during his direct and cross examinations Mr. Porter had no idea he might elicit information that could be useful to such a strategy. Furthermore, he made no attempt whatsoever to draw the jury's attention to any gaps in the state's evidence, and never otherwise articulated a reasonable doubt theory to the jury. Consequently, the accidentally

-22-

elicited damaging testimony remained just that, damaging, rather than part of a strategy designed to benefit his client. Where an attorney accidentally brings out testimony that is damaging because he has failed to prepare, his conduct cannot be called a strategic choice: an event produced by the happenstance of counsel's uninformed and reckless cross-examination cannot be called a "choice" at all. *See Strickland*, 466 U.S. at 691 (counsel's failure to investigate must be product of a reasonable decision that the particular investigation is unnecessary or it is deficient). We conclude counsel's uncontroverted failure to investigate some of the most obvious aspects of the case was unreasonable and deficient.

Mr. Porter was also incompetent with respect to investigating his client's asserted alibi. Mr. Porter apparently made no attempt prior to trial to obtain the Salvation Army letter from Coffeyville, which was in the possession of the attorney who represented Mr. Fisher at his extradition hearing in Buffalo. Mr. Fisher himself appeared uncertain at times about the exact dates on which he was in Coffeyville. If the letter confirmed Mr. Fisher stayed in Coffeyville but also revealed he still could have committed the murder, counsel could have made a decision not to present this defense because it would not help establish his client's innocence. Moreover, Mr. Porter's manner of questioning his client exposed Mr. Fisher's uncertainty about the dates involved and reiterated several times that Oklahoma City was the location from which he traveled to Coffeyville. This tended to emphasize the factual possibility that Mr. Fisher was in Oklahoma

-23-

City at the time of the crime and, even more repugnant to a counsel's duty to his client, tended to undermine his own client's credibility.

Relatedly, as we discuss *supra*, Mr. Porter also apparently failed to discover the fact that although Mr. Fisher allegedly told the Buffalo police he met someone named Terry and hit him with a bottle, he also stated this event occurred in September or October 1982, two months before the murder occurred, and the Terry he met was black, while the victim was white. *See* rec. vol. 2, doc. 219, Extradition Hr'g Tr. at 29-31. As a result, Mr. Porter was unprepared to use these exculpatory statements to rebut the inculpatory nature of the other statements Buffalo Detective Dove testified Mr. Fisher made. This is particularly notable given how Mr. Porter examined his own client: while Mr. Porter was unwilling or unable to reveal evident holes in the state's case, he was remarkably successful in undermining his own client's testimony.

Also due at least in part to inadequate investigation, counsel failed to utilize the fact that the police had initially charged Mr. Johnson with Mr. Neal's murder. *See* rec. vol. 2, doc. 191, Attach. 1-2. Mr. Fisher asserts Mr. Porter was deficient for failing to cross-examine Mr. Johnson on this issue after eliciting the same information from him in the preliminary hearing and after Mr. Johnson admitted the charge on direct examination.[8] Rec. vol. 2, doc. 191 at 3-5. We

_____

[8] The district court refused to consider this allegation on the ground that Mr. Fisher's claim was based on a faulty premise. However, the court misread the

(continued...)

-24-

agree with Mr. Fisher that in view of Mr. Johnson's admission at the preliminary hearing, counsel should have obtained documentation of the charge and used it at trial. Although this evidence was available from the prosecutor's files, *id.,* doc. 191, Attach. 1-2, counsel failed to make any discovery requests and therefore had no documentation of the charge to use at trial. Rec. vol. 3 at 14; *see also id.,* doc. 215 at 7 n.7 (noting Mr. Porter failed to file any discovery motions). At trial, Mr. Johnson admitted being charged with murder in his direct testimony. Nonetheless, Mr. Porter failed to follow up the admission on cross-examination or otherwise call attention to the fact that Mr. Johnson had initially been charged with the murder. Trial Tr. vol. II at 303-25. After Mr. Johnson testified, Mr. Porter did ask Officer Andrews twice whether Mr. Johnson had been charged with the murder, but when Officer Andrews denied this unequivocally, Mr. Porter was unable to challenge this statement because of his failure to obtain documentation to resolve the dispute. We can conceive of no strategic reason for failing to document the fact that a key state witness had originally been charged in the murder and therefore had a motive to exonerate himself by accusing the

---

[8](...continued)
claim. The court construed Mr. Fisher's claim as stating that counsel was deficient because he *did not know* that Mr. Johnson had been charged with murder. The court refused to consider the claim because Mr. Porter clearly *did* know Mr. Johnson was charged with the murder (having elicited this statement both at the preliminary hearing and on cross-examination at trial). However, Mr. Fisher never claimed Mr. Porter was *unaware* that Mr. Johnson had been charged with the crime; rather, Mr. Fisher's complaint was that counsel did know of the charge and did nothing to use this information to Mr. Fisher's advantage.

defendant. Indeed, Mr. Porter could neither remember nor offer any strategic explanation for his failure in this respect. Rec. vol. 3 at 23-33. We conclude counsel's lack of preparation in this regard also constituted deficient investigation.

**b.** *Advocacy and Loyalty*

The most egregious errors and omissions by Mr. Porter cannot be explained solely by a failure to investigate his client's case but rather point to counsel's failure to act as a diligent and loyal advocate for his client. Portions of the trial transcript show that in his direct and cross-examinations, Mr. Porter both elicited new damaging testimony and frequently reiterated damaging testimony or evidence that, even without adequate investigation, Mr. Porter must have known would harm his client's case. Not only did Mr. Porter pursue these actions without any apparent strategy, he also exhibited hostility to his client and sympathy and agreement with the prosecution in ways that put his actions directly at odds with his client's interests. Some of these actions constitute such ineptitude or lack of diligence they amount to objectively deficient advocacy on the part of Mr. Porter. Other actions by Mr. Porter such as hostility toward his client point to a more blatant and fundamental violation of Mr. Porter's duty of loyalty to his client. Both relate to counsel's duty to act as his client's loyal advocate and adversary of the state. We deal with counsel's inept performance

and breach of client loyalty in turn, concluding that both types of actions constituted deficient representation by Mr. Porter.

We note preliminarily that Mr. Porter admitted he harbored animosity toward his client and that these feelings affected his representation.

> [Mr. Fisher] and I clashed constantly. He was a very hostile client and we would often get into shouting matches. Also at that time I thought homosexuals were among the worst people in the world, and I did not like that aspect of this case. I believe my personal feelings towards James Fisher affected my representation of him.

Rec. vol. 2, doc. 219, Aff. of E. Melvin Porter, March 29, 1996. Mr. Porter further related that Mr. Fisher refused to accept a plea agreement with the state, and that this may also have turned Mr. Porter against his client. *Id.* An attorney's concession of animosity makes it "appropriate to scrutinize counsel's performance with a somewhat more critical eye." *Hale v. Gibson*, 227 F.3d 1298, 1314 (10th Cir. 2000), *cert. denied*, 121 S. Ct. 2608 (2001).

Some of counsel's unprofessional conduct was deficient because it was grossly inept. For example, Mr. Porter's cross-examination of Detective Dove without discovering prior to trial what the detective might say certainly reflected ineptitude. Mr. Porter engaged in the dangerous and indefensible practice of conducting a fishing expedition with a police witness on cross-examination merely in order to learn what the police had found when they arrested Mr. Fisher. Rec. vol. 3 at 37-38. Mr. Porter also eschewed the chance to cross-examine Detective Dove on these issues *in camera* right before the detective testified in

front of the jury. Trial Tr. vol. III at 327-56. The cross examination of Officer Andrews is another example. After Mr. Porter successfully excluded Officer Andrews' direct testimony concerning a blood-covered fingerprint in the victim's car, *id.* vol. II at 272, he inexplicably reintroduced the subject on cross-examination and allowed Officer Andrews to restate the same testimony, this time on the record, *id.* at 273-74.

Mr. Porter's representation was incompetent in other ways as well. While it is all too common for defense counsel to pursue lengthy and unfocused cross-examination without a clear purpose in mind, this will not always amount to deficient performance. What made Mr. Porter's conduct different is that, to begin with, his cross-examination served solely to allow prosecution witnesses to reiterate the state's evidence, and did not challenge the testimony or the witnesses' credibility in any way. *See id.* vol. III at 304-20 (cross-examination of Mr. Johnson); *id.* at 365-69 (cross-examination of Detective Dove); *id.* vol. II at 273-87 (cross-examination of Officer Andrews). Even worse, Mr. Porter directly bolstered the credibility of state witnesses, as is evident from this exchange between Mr. Porter and Detective Dove on cross examination:

> Q: But now *you're a police officer with 37 years of experience and you've been with homicide for a number of years, 20-some years,* and you saw clothes that purportedly carried blood on them, *that in your opinion was bloodstains;* is that right?
> A: That's right.

*Id.* at 368 (emphasis added); *see also id.* at 317 (reiterating testimony that Mr. Johnson related his version of the murder to his school principal).

We have held similar actions by trial counsel constituted deficient performance because counsel's actions merely served to "reiterate [ ] evidence and underscore its validity without casting any doubt on it." *Stouffer v. Reynolds,* 168 F.3d 1155, 1164 (10th Cir. 1999) (*Stouffer I*) (remanded for evidentiary hearing); *see also Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000) (*Stouffer II*) (finding prejudice after remand). In *Stouffer I*, we rejected the assertion that counsel was pursuing a strategy of demonstrating inconsistencies in the government's evidence, pointing to a trial record that showed counsel was inadequately prepared for trial and then examined witnesses ineptly to his client's detriment by reiterating damaging testimony and failing to test key pieces of evidence. 168 F.3d at 1165. Our statement there is highly relevant here:

> If defense counsel's trial strategy was to 'show the inconsistency of the evidentiary facts,' the record reveals the strategy served to reinforce the State's evidence without ever, except for Petitioner's isolated testimony, presenting a case in defense. . . . To shelter these facts with the mantle of trial strategy defies experience, we believe, and countenances deficient performance in such a high-stakes setting.

*Id.* We held that, taken together, the actions of counsel constituted ineffective assistance of counsel. *Id.* at 1163-64. Similarly here, as isolated incidents these errors might not rise to the level of objectively unreasonable performance but, as in *Stouffer I*, we think that "cumulatively, each failure underscores a fundamental

lack of formulation and direction in presenting a coherent defense." *Id.* at 1164.
We are convinced that through these shortcomings counsel failed to "exercise . . .
the skill, judgment, and diligence of a reasonably competent defense attorney."
*Osborn*, 861 F.2d at 625 (internal quotation omitted).

We are also persuaded that Mr. Porter demonstrated a more fundamental
violation of his duty of loyalty by exhibiting actual doubt and hostility toward his
client's case. Nowhere is this more evident than in Mr. Porter's treatment of Mr.
Fisher while he testified in his own defense. During this direct examination, Mr.
Porter badgered Mr. Fisher, elicited damaging and irrelevant testimony through
entirely inappropriate questions, and was generally hostile towards his own client.
For example, after establishing that Mr. Fisher had been discharged from the army
for possession of marijuana, Mr. Porter inexplicably went on to question Mr.
Fisher extensively about other possible drug use in a manner that could only
impugn his client's character and result in the presentation of irrelevant and
prejudicial testimony to the jury:

> Q: What else did [the police] find on you [at the police station at the time of arrest]?
> A: He found some marijuana and I had a syringe, I think.
> Q: A narcotic syringe?
> A: Yeah.
> Q: Have you used narcotics, son?
> A: No, I haven't used any.
> Q: Well, why did you have a syringe?
> A: The reason was because I – at the time I came back home, my brother, you know, he used to use it and  – well, he, you know –
> Q: Okay.

-30-

A: I'm not saying that he does.
Q: I understand.
A: But –
Q: *Have you got any needle marks on your arm?*
A: *No.*
Q: *Your hand?*
A: *No, sir.*
Q: *Raise the sleeve of your arm up.*
A: *(Complied.)*
Q: *Turn your arm over.*
A: *(Complied.)*
Q: *Okay. Raise the other one.*
A: *(Complied.)*
Q: *Raise that arm all the way up so I can see the bend of your arm.*
A: *(Complied.)*
Q: *Okay. Now I notice some marks on your hand there. Where did that come from?*
A: *Well, this here – I can't really recall.*
Q: *Well, it looks like a track. Is that a track where you've stuck needles in your hand?*
A: No, no. It's – it's not a track. I have seen tracks before, and I know if I've shot up dope or not.
Q: So you don't shoot dope.
A: No.
Q: *But you had a syringe on you and you had some marijuana on you; is that right?*
A: *Right.*

Trial Tr. vol. III at 425-26 (emphasis added).

In several instances Mr. Porter repeated to Mr. Fisher the state's evidence, such as witness statements, and asked him not only one time, but several times, whether the evidence was truthful. In doing so, Mr. Porter essentially berated his client. The following exchange is typical:

Q: All right. After that, did you ever go any place with Fadjo?
A: No, I never went no place –
Q: Did you ever get in the car with him?

-31-

> A: No, I haven't.
> Q: You never rode in a car with him?
> A: No.
> Q: You heard Fadjo Johnson testify that you –
> A: Yes, that I – I rode in a car. You know, I heard him testify, you know, to that.
> Q: Did you ever drive a car while you were in Oklahoma City?
> A: No, I can't – I can't say I drove one, I don't own one.

*Id.* at 422.

Later in the examination, immediately after asking Mr. Fisher about possible track marks on his arm, counsel resumed questioning him about riding in the victim's car with Fadjo Johnson, asking, "And you don't ever recall being in that car, the picture I showed you of that car; is that right?" *Id.* at 426. At this point, Mr. Fisher stated there might have been a possibility that he rode in a car and, in answer to further questioning from Mr. Porter, stated he might have been picked up by a "white guy." Mr. Porter went on to ask in rapid succession whether Mr. Fisher had hit anyone over the head with a bottle, killed the victim, hit the victim over the head with a bottle, used "that" wine bottle to cut the victim's throat, or ever had sex with a man. *Id.* at 427-429. Several questions later, Mr. Porter again asked Mr. Fisher whether he had ever been in a car with Fadjo Johnson, which Mr. Fisher again denied. *Id.* at 434.

The rest of Mr. Porter's direct examination is much the same. Mr. Porter reiterated virtually all of the state's evidence against his client, repeatedly asking him to explain that evidence or simply asking rhetorically whether Mr. Fisher was

aware of it.  In just one example of Mr. Porter's treatment of his client, Mr. Porter reiterated most of Detective Dove's testimony and asked Mr. Fisher to explain it, asking Mr. Fisher whether he had any bloody clothes that he was aware of and whether he was aware Detective Dove testified that "[he] took the jacket off of you and it appeared to have blood in the coat pocket and blood on the side of the clothes. . . ." *Id.* at 435.  Mr. Porter's direct examination of Mr. Fisher resembles a police interrogation of a hostile suspect rather than the presentation of a defense.  Mr. Porter appeared to the jury to have been badgering his own client in an attempt either to browbeat Mr. Fisher into changing his story or simply to convey the impression that his client's denials were not believable.

The district court suggested Mr. Porter was not deficient[9] with respect to eliciting Mr. Fisher's testimony about possible drug possession and use because, it found, Mr. Fisher's answers were nonresponsive to the particular questions Mr. Porter had asked.  Because the court concluded that Mr. Fisher had therefore volunteered these answers, it found no fault on the part of Mr. Porter.  Rec. vol. 2, doc. 215 at 13 n.22.  We disagree.  The district court might be correct as to the portion of the drug-related testimony of Mr. Fisher regarding the initial discovery of marijuana and a syringe.  However, this volunteered evidence does not explain or excuse Mr. Porter's subsequent interrogation and physical examination of his

---

[9] The district court did not hold definitively that Mr. Porter was not deficient, instead dismissing this claim for lack of prejudice.  Rec. vol. 2, doc. 215 at 12-13.

client regarding whether he was an intravenous drug user with old track marks on his arm, questions which were irrelevant, abusive, and appeared designed to leave the jury with the impression that Mr. Fisher was a lying intravenous drug addict. More to the point, Mr. Fisher in no sense "volunteered" nonresponsive answers to these questions. The district court's observation similarly does not explain the inappropriate way in which Mr. Porter generally interrogated his client. Trial Tr. vol. III at 425-26; *see also id.* at 416-17 (asking Mr. Fisher whether he had ever used narcotics, smoked marijuana, or sniffed paint). We can neither discern nor conceive of a trial strategy that would justify this treatment of one's own client, which so clearly cast doubt upon the client's defense and his credibility and integrity before the jury.

Significantly, Mr. Porter's treatment of Mr. Fisher contrasts remarkably with Mr. Porter's treatment of the state's primary witness for the prosecution, Mr. Johnson, as the following excerpts of his cross-examination demonstrate. In the first excerpt, Mr. Porter suggested that he believed Mr. Johnson's version of the story, emphasized that the crime was "horrible," sympathized with Mr. Johnson, and elicited testimony from him that he was attempting to improve his life:

Q: Are you trying to straighten up your life now, son?
A: Yes.
Q: Do you understand that if what you said is the truth, you've witnessed and been a party indirectly – *not directly* – I'm not saying you've been a party or

*anything but you've been a party participant in the sense that you saw what occurred –*

       MR. PORTER: *I'm not going to berate this young man.*

Q*: but you saw what occurred, and it was horrible*?

A: Right.

Q: And if what you're saying is true, it could very easily have happened to you?

A: Right.

Q: And you're telling me that you're trying to straighten your life up now?

A: Yes. I don't like being in jail.

*Id.* at 310 (emphasis added).

Mr. Porter again suggested he believed Mr. Johnson's story, elicited more

sympathetic testimony, and allowed Mr. Johnson to add details to his testimony

that made his story more credible:

Q: You talked with your friend who was the principal of the school?

A: Yes.

Q: And told him these things – all of this. What you related to him is what you related to this jury?

A: Yes. I just – I told him that I had seen this person get killed, you know.

Q: I understand. You told him basically what you told this jury.

A: Yeah.

Q: Without getting into a lot of detail?

A: Yeah.

Q: *And you told him you couldn't sleep?*

A: Right.

Q: *And it was bothering you quite a bit?*

A: Right. I just wanted to talk to somebody.

*Id.* at 316-17 (emphasis added).

Later Mr. Porter elicited more sympathetic testimony from Mr. Johnson:

Q: If for some reason that you were asked to take some in depth counseling and testing and try to help you straighten your life out, would you do it?

A: Yes, sir.

Q: You really need – still need some help, don't you? You

-35-

can't solve all these problems you have had for yourself. Don't you feel
that you still need some help to straighten your life out?
A: It's just that I need somebody to talk to that isn't related to my
problems that I can talk to about my problems.
Q: I understand. And you've had some deep problems that
emotionally go very deep. And you've had some relationships that have
been very deep.
A: Yes, sir.

*Id.* at 319.

In summary, Mr. Porter made several statements that suggested he believed Mr. Johnson's story. He was also much more sympathetic towards Mr. Johnson than his client regarding drugs and homosexuality, eliciting favorable testimony from Mr. Johnson while he berated his own client about these irrelevant subjects.[10] In addition, Mr. Porter failed to challenge Mr. Johnson's version of events, establish definitively he had been charged with the murder as discussed above, or otherwise challenge his credibility in any respect.

It was particularly unprofessional for counsel to sympathize with this witness and indicate he believed his story. Mr. Johnson's testimony implicating Mr. Fisher also exonerated Mr. Johnson, after witnesses placed him with the victim the night of the murder, *id.* at 266-68, and after police charged Mr. Johnson with the crime, rec. vol. 2, doc. 191, Attach. 1. Even recognizing that

---

[10] We recognize that Mr. Porter questioned Mr. Johnson almost as thoroughly as Mr. Fisher regarding his apparent homosexuality, asking for details regarding his sexual history and history of prostitution. However, Mr. Porter also elicited from Mr. Johnson more than one time that Mr. Johnson was trying to "straighten up," sympathetic treatment he did not accord his client.

-36-

the incidental details of Mr. Fisher's alleged confession were corroborated somewhat by Mr. Johnson, the case turned primarily on Mr. Fisher's word against that of Mr. Johnson.[11] By indicating belief in Mr. Johnson's story, particularly

---

[11] Significantly, there are several aspects of this case that were largely not presented or argued to the jury which tend to undermine the credibility of *and/or implicate* Mr. Johnson, the state's star witness. These items therefore relate to both the various deficiencies of counsel we identify and to prejudice. Although some of these matters are discussed in other sections to which they are relevant, we summarize them here to note the case counsel might have presented to implicate Mr. Johnson and exonerate his client:

1) Mr. Johnson was initially charged with the murder but the charges were dropped after he implicated Mr. Fisher to the police. One explanation for this, given that it occurred after Mr. Johnson implicated Mr. Fisher, is that the state might have preferred to charge Mr. Fisher, who was an adult, rather than Mr. Johnson, who was a juvenile at the time of the murder. In addition Mr. Johnson may have agreed to testify in exchange for the police dropping the charges, but this was never explored at trial. It was an issue about which the jury was explicitly concerned. *See infra* p. 50.

2) Mr. Johnson's veracity was questionable even according to his closest allies: Mr. Johnson's former school principal and confidant, Mr. Fry, testified he did not believe Mr. Johnson's story about witnessing a murder when Mr. Johnson called him because Mr. Johnson had sent him "on several wild goose chases." Trial Tr. vol. II at 322-23;

3) Aspects of Mr. Johnson's story, while not necessarily obviously false, are open to question in ways that might put other aspects of his testimony in a less credible light. For example, Mr. Johnson testified that he was sitting on the couch next to Mr. Neal and Mr. Fisher watching TV, in Mr. Neal's apartment, when Mr. Neal and Mr. Fisher started having sex; that while they were having sex he went outside and walked around, and that when he came back inside Mr. Fisher and Mr. Neal had just finished having sex and at this point he watched as Mr. Fisher started stabbing Mr. Neal with a bottle. *Id.* at 292-93. However, Mr. Johnson's principal testified Mr. Johnson had told him he met up with Mr. Neal and

. . .went partying and what have you, and he said *while he was getting dressed* . . . there was some confusion *in the other*

(continued...)

the elements of it that most directly implicated his client, Mr. Porter undermined

virtually *any* defense Mr. Fisher might have had — and certainly any defense Mr.

Porter tried to present, to the extent he presented a defense at all. Under these

circumstances, moreover, some of the statements quoted above border on implied

concessions of Mr. Fisher's guilt by Mr. Porter.

Counsel's duty of loyalty includes not only the duty to operate free of

third-party conflicts of interest, but also the duty to act as an adversary vis-a-vis

the state. "An effective attorney 'must play the role of an active advocate, rather

than a mere friend of the court.'" *Osborn*, 861 F.2d at 624 (quoting *Evitts v.*

---

[11](...continued)

> *room*. And it was then that he mentioned that apparently
> someone was cut or stabbed. And that *when he walked into the*
> *room* that someone was bleeding and blood spattered on him.

*Id.* at 321-22 (emphasis added). Mr. Fry's testimony therefore
contradicted Mr. Johnson's testimony that he *did not* have sex and
that he *did* witness Mr. Fisher stab Mr. Neal. These contradictions
cast doubt on Mr. Johnson's version of other events as well. Mr.
Johnson claimed the murder occurred inside Mr. Neal's apartment,
and immediately after Mr. Fisher had sex with Mr. Neal. This is
arguably inconsistent with Detective Dove's testimony that the police
found bloodstains on Mr. Fisher's jacket and, moreover, on the
*outside* of the jacket, if we presume the sex to which Mr. Johnson
testified involved Mr. Fisher removing his clothing. (Our
presumption is corroborated by one version of events Mr. Johnson
apparently gave to police. *See* Aplt. Br. Attach. B at 10. This
statement was not produced to the defense and is the subject of Mr.
Fisher's *Brady* claim.). The testimony about the bloodstains is more
consistent with Detective Dove's further testimony that Mr. Fisher
stated at the time of his arrest that he was *outside* when he hit
someone named Terry over the head with a bottle. *See* Trial Tr. vol.
III at 363.

*Lucey*, 469 U.S. 387, 394 (1985)); *see also Cronic*, 466 U.S. 656-57 ("if the process loses it character as a confrontation between adversaries, the constitutional guarantee is violated."). Indeed, we stated in *Osborn* that the duty of loyal advocacy is more vital to effective assistance than the absence of third party conflicts of interest:

> [A]n attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition.

*Id*. at 629.

Implying a client's guilt by repeatedly lending support to the state's version of events, as Mr. Porter did here, is virtually tantamount to a concession of guilt.[12] It certainly constitutes a failure to oppose the state's case with reasonable diligence and therefore violates the duty of loyalty to his client. *See Osborn,* 861 F.2d at 629 (finding *Strickland* deficiency and prejudice under "any applicable

---

[12] When an attorney concedes his client's guilt, for example by stating there is no reasonable doubt that he committed the crime, the Ninth Circuit has concluded there is a constructive denial of counsel because such concessions "demonstrate[] the constructive absence of an attorney dedicated to the protection of his client's rights under our adversarial system of justice." *United States v. Swanson*, 943 F.2d 1070, 1075 (9th Cir. 1991); *see also Osborn v. Shillinger*, 861 F.2d 612, 629 (10th Cir. 1988) (finding prejudice "under any applicable standard" where counsel appeared to operate under conflict of interest). Because we conclude *infra* that these actions and others gave rise to actual prejudice, we do not address whether any of these specific statements amounted to an express concession of defendant's guilt that would warrant a presumption of prejudice.

standard" where counsel "acted with reckless disregard for his client's best interests and, at times, apparently with the intention to weaken his client's case").

Mr. Porter's respective examinations of Mr. Fisher and of Mr. Johnson on the stand constituted blatant failure to act as his client's advocate and the state's adversary, and as such constituted deficient performance. Taken together, they indicate a pervasive failure on the part of Mr. Porter that borders on a conflict of interest similar to that we found in *Osborn*. We have little trouble concluding that Mr. Porter failed to adhere to his duties of loyalty to his client and of fulfilling his adversarial role in the trial process.

c.    *Closing Argument*

Mr. Porter also failed to present a closing argument. He testified at the evidentiary hearing that defense closings sometimes invite more damaging closings by the prosecution. Rec. vol. 3 at 44-45. On this basis, the district court found that Mr. Porter had made a strategic choice not to present a closing argument, *id.* vol. 2, doc. 215 at 15, and concluded Mr. Fisher had failed to prove this strategy was unreasonable or that it prejudiced him, *id.* at 15-16. Mr. Porter testified regarding his decision as follows: "*I have to believe* the reason I did not make the closing argument is I didn't want to appear to be foolish and try to hoodwink the jury into believing an argument that was not believable *and that's the best conclusion I can tell you*." *Id.* vol. 3 at 46 (emphasis added). As we stated above, "[t]he mere incantation of strategy does not insulate attorney

-40-

behavior from review." *Breechen*, 41 F.3d at 1369 (quotations and citations omitted). Mr. Porter's testimony suggests an attempt to provide an ex post facto justification for a decision that was apparently not given any serious thought at the time. It also reflects a desire on Mr. Porter's part to save himself personal embarrassment rather than a desire to act in the best interests of his client. A strategic choice on the part of counsel requires more than the attorney's after-the-fact, conclusory, and equivocal statement that he "thinks" he had a strategy of avoiding counterargument by the prosecution and discomfort in front of the jury. *See id.* Furthermore, as we noted *supra*, Mr. Porter had previously conceded that his personal animosity towards Mr. Fisher affected his representation. In specific reference to his failure to present a closing argument, Mr. Porter had stated, "My personal feelings towards Mr. Fisher and his case are the only reason I can think of to explain why I waived those closing arguments." Rec. vol. 2, doc. 219, Aff. of E. Melvin Porter, March 29, 1996. This statement certainly casts doubt upon any later attempt to explain the same omission as strategic.

Even assuming Mr. Porter engaged in some strategic reflection at the time of trial, an attorney's strategic choices are still subject to the standard of objective reasonableness. *See Strickland*, 466 U.S. at 691. A closing statement was virtually demanded in this case by the state of the evidence at the trial, which included the prosecution's failure to produce any inculpatory physical evidence, the testimony counsel elicited that was detrimental to the defense *unless* counsel

-41-

used it to argue a reasonable doubt theory, and counsel's failure to present an opening statement. A closing statement might have served to point out holes in the state's case – including the lack of physical evidence – thereby providing a rationale for the jury to use detrimental testimony in favor of Mr. Fisher rather than against him as the jury was almost certain to do in the absence of explanation. A closing might also have overcome the detrimental impact of counsel's hostile treatment of his client while he was on the stand, which likely conveyed a belief on the part of his own counsel that Mr. Fisher was guilty and his defense hopeless. Under these circumstances, including counsel's failure to advance a theory of defense in other portions of the trial and his actions that in the absence of explanation almost certainly hurt Mr. Fisher's case, we conclude it was objectively unreasonable for counsel to fail to make a closing statement.

### d. *Theory of Defense*

Finally, Mr. Porter failed in general to advance any defense theory, even that of reasonable doubt. The case against Mr. Fisher was hardly overwhelming, consisting primarily of the testimony of one self-interested witness and no inculpatory forensic evidence. The state's case was thus susceptible to a "reasonable doubt theory." Even so, defense counsel failed to argue this line of defense at any point during the trial, or even point out to the jury weaknesses in

-42-

Mr. Johnson's credibility[13] or the lack of inculpatory physical evidence, and thus failed to require the state to shoulder its burden of proving its case beyond a reasonable doubt. Counsel has a duty, at the minimum, to hold the state "to its heavy burden to prove guilt beyond a reasonable doubt." *Cronic*, 466 U.S. at 657 n.19. That most basic duty was not met here.

We recognize that particular instances of counsel's conduct here might not, standing alone and under different circumstances, constitute deficient representation. Under other circumstances, it might be reasonable trial strategy for counsel to indicate sympathy for a prosecution witness, elicit forensic evidence the state had not sought to present, or adopt a tough stance with one's client. *See Strickland*, 466 U.S. at 688-89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel . . ."). In cases in which we have found such actions or omissions were not deficient, however, the circumstances revealed that those actions or omissions were part of identifiably reasonable trial strategies calculated to benefit the defendant in some way. *See, e.g., Hale v. Gibson,* 227 F.3d at 1323

---

[13] As Mr. Porter eschewed all opportunities to argue some theory of defense to the jury, he failed, as discussed above, to challenge Mr. Johnson's credibility based on the police initially charging him with the murder. Mr. Porter also failed to argue to the jury that Mr. Johnson was not credible because, as his school principal testified, Mr. Johnson frequently sent him on "wild goose chases" and as a result the principal "didn't believe he was serious" when Mr. Johnson told him he had witnessed a murder. Trial Tr. vol. II at 322-23.

(holding counsel made "reasonable strategic decision to concede some involvement by [defendant], given the overwhelming evidence presented at trial, and focused on the extent of his involvement and whether others could have been involved."); *Fowler v. Ward*, 200 F.3d 1302, 1310-11 (10th Cir. 2000) (finding no ineffective assistance where counsel conceded defendant's presence at crime scene because concession was consistent with defense theory advanced that defendant was not the principal in alleged conspiracy), *overruled on other grounds*, *Moore v. Marr*, 254 F.3d 1235, 1240 (2001); *United States v. Williamson*, 53 F.3d 1500, 1511 (10th Cir. 1995) (finding no ineffective assistance where counsel's statement that defendant might have used and sold drugs was not an express admission of guilt to drug conspiracy charged, and statement was consistent with defense theory that state nevertheless lacked evidence linking defendant to alleged drug conspiracy). Here, the actions we find deficient were not part of any trial strategy and were otherwise predictably detrimental to Mr. Fisher's defense. Accordingly, in this case these acts constituted objectively unreasonable conduct.

We also recognize, as did the district court, that Mr. Porter acted as an active adversary to the state in certain respects. We note for example that Mr. Porter successfully moved to have a videotape suppressed because it was taken in violation of Mr. Fisher's Miranda rights, Trial Tr. vol. III at 355-57, objected vigorously, although unsuccessfully, to the admission of crime scene photos as

-44-

unnecessarily prejudicial, *id.* vol. II at 240-50, and attempted to obtain a continuance when his client told him that medication he was taking made him unable to testify, *id.* vol. III at 370-409. Nevertheless, these actions do not compensate for the serious shortcomings of Mr. Porter's overall defense. The duty of counsel is not merely to do "something" rather than nothing on behalf of one's client, but to act as the client's effective advocate during each critical stage of the defense. *Cronic*, 466 U.S. at 659 & n.25; s*ee also Murray v. Carrier*, 477 U.S. 478, 488 (1986) (single error may constitute ineffective assistance of counsel); *Strickland*, 466 U.S. at 695-96 (effect of any particular error depends on circumstances of the case). Here, through numerous shortcomings, omissions, and outright disloyalty, counsel failed to act as a reasonably competent advocate for his client, even if his representation included some isolated instances of effectiveness or professionalism.

In sum, Mr. Porter's performance fell below objectively reasonable standards of professional attorney conduct. Counsel was deficient for failing to adequately investigate; failing through apparent ineptitude to act as a reasonably diligent and professional advocate; failing through his hostility to his client and his client's interests, and his apparent sympathy and assistance for the state's case, to act as his client's loyal advocate; failing to advance any defense theory, even that of holding the state to its burden of proof; and, under the circumstances,

failing to make a closing argument.  We turn now to an assessment of prejudice under *Strickland*.

### *Prejudice*

The prejudice prong of *Strickland* requires a defendant to show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  The prejudice defendant must demonstrate is by less than a preponderance of the evidence: "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the trial."  *Id.* at 693; *see also Williams v. Taylor*, 529 U.S. 362, 405-06 (O'Connor, J., concurring) (state court rejection of ineffectiveness claim on grounds that prisoner failed to establish by "a preponderance of the evidence" that the outcome would have differed would be contrary to clearly established precedent).

In assessing whether Mr. Fisher was prejudiced by his counsel's errors, we examine the totality of the evidence.  *Id.* at 695.  Our focus is on the fairness of the trial he received, *Cronic*, 466 U.S. at 655-56; a showing of innocence is not required, *Osborn*, 861 F.2d at 630 n.17 (quoting *Kimmelman,* 477 U.S. at 380 ("We have never intimated that the right to counsel is conditioned upon actual innocence.")).

The district court concluded Mr. Fisher was not prejudiced in the guilt phase by any deficient performance of counsel. With regard to counsel's failure to investigate, the court focused on Mr. Fisher's failure to present exonerating evidence or a theory of innocence that counsel failed to discover and assert at trial. Rec. vol. 2, doc. 215 at 8-9. In addition, the court was not persuaded counsel's elicitation from Mr. Fisher of drug-related testimony or counsel's failure to make a closing argument sufficiently undermined confidence in the outcome of the trial. We disagree with these conclusions.

The nature of this case made counsel's errors prejudicial. The prosecution's case against Mr. Fisher was not overwhelming. The state produced no physical evidence linking Mr. Fisher to the murder despite obtaining allegedly bloody clothing from him and fingerprints from the victim's car and apartment. That the only evidence tending to suggest a physical link between Mr. Fisher and the murder was brought out by Mr. Porter's examination is simply the first example of how Mr. Porter undermined his own client's case.

The trial was in essence a swearing match between Mr. Fisher and Mr. Johnson, either of whom could have committed the murder, and counsel's errors in this regard actively undermined this critical component of the defense.[14] Mr.

_____

[14] In fact, absent the testimony regarding physical evidence elicited by Mr. Porter (that could have been inculpatory *or* exculpatory), the case would have turned solely on credibility.

Porter's examinations of both Mr. Fisher and Mr. Johnson destroyed Mr. Fisher's credibility while bolstering that of the primary witness against him. Mr. Porter's questions to his client indicated his belief that Mr. Fisher was untruthful (and, as an intraveneous drug-user, untrustworthy), while his questions to Mr. Johnson allowed Mr. Johnson to be portrayed – even by purportedly adverse defense counsel – as an unfortunate child who had been led astray, was in the wrong place at the wrong time, and wanted to turn his life around.

Mr. Porter damaged his client's credibility in other ways. He failed to investigate the alibi Mr. Fisher tried to present, and then undermined Mr. Fisher's credibility by questioning him in a manner that made his testimony incoherent, uncertain, and above all unbelievable. An investigation, for example to obtain the letter presented at the extradition hearing attesting that Mr. Fisher had stayed at a Salvation Army in Coffeyville, Kansas the evening after the murder, might have bolstered Mr. Fisher's alibi defense by tending to prove that he could not have committed the crime because he was either in Coffeyville at the relevant time or en route there. Conversely, an investigation might have done nothing to exculpate Mr. Fisher, in which case Mr. Porter should have advised Mr. Fisher not to mention items such as the letter at all. As it was, Mr. Fisher testified about such items and claimed they were exculpatory, while his counsel not only failed to produce them to demonstrate that they helped his client's alibi, he instead questioned his client so as to convey disbelief. The jury was left to surmise that

-48-

counsel did not offer evidence to support the alibi because he believed his client had no alibi, thus delivering a devastating blow to his client's credibility.

Just as he destroyed his own client's credibility and bolstered the credibility of the star witness for the prosecution, counsel failed to challenge the credibility of any other state witness. Moreover, he sabotaged his client's defense by repeatedly reiterating the state's version of events and the damaging evidence he had elicited himself, which served not only to remind the jury of the state's version but also to convey the impression he believed that version rather than his client's. Finally, by treating his client in an abusive and hostile manner on the stand, especially compared to the sympathy and credulity he displayed towards Mr. Johnson, and by failing to address a single word to the jury on behalf of his client during the entire course of the trial, counsel conveyed not only greater faith in the state's case compared to his client's, but also the general impression that he believed his client deserved to be found guilty. As Bryan A. Stevenson, an expert on professional standards for death penalty counsel, testified at the evidentiary hearing, conveying belief in a client's guilt, eliciting information that presents one's client in a disfavorable light, and conveying a lack of a desire to defend one's client can greatly prejudice a defendant in a jury's eyes. *See* rec., vol. 3 at 248. We think this type of demonstrated hostility on the part of counsel makes it particularly unlikely that a jury will resolve any doubts it may have in a defendant's favor.

Questions submitted by the jury during deliberations, which the trial court declined to answer, support our conclusion that credibility was key and that the jury had unresolved questions in this regard. The jury's questions included:

1)    "DID THEY FIND THE T.V.?"

2)    "IS THE DEFENDANT LEFT OR RIGHT HANDED?"

3)    "DID THEY ANALYZE THE BLOOD ON DEFENDANTS CLOTH [sic] TO THAT OF TERRY NEAL'S BLOOD?"

4)    "WERE ANY OF THE DEFENDANT'S FINGERPRINTS FOUND ANYWHERE?"

5)    "WOULD LIKE TO SEE THE POLICE REPORTS"

6)    "WHERE ARE THE CLOTHES WITH BLOOD?"

7)    "DID FADJO TURN STATE [sic] EVIDENCE?"

Rec. vol. 2, doc. 219. These questions indicate the jury had doubts about crucial aspects of the case that Mr. Porter failed to address in his defense, including Mr. Johnson's credibility and the state's lack of physical evidence against Mr. Fisher. These questions weigh in favor of finding prejudice here: counsel could have, but did not, present available evidence or arguments in his client's *favor* on each of these subjects; and we assume by the state's failure to present evidence *against* Mr. Fisher with respect to any of these questions, that it had no such evidence. *See Strickland*, 466 U.S. at 696 (considering totality of the evidence requires

-50-

"[t]aking the unaffected findings *as a given*, and taking due account of the effect of the errors on remaining findings . . .") (emphasis added).

"[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. The state's case here was hardly overwhelming: it suffered from a notable lack of physical evidence and depended greatly on the testimony of Mr. Johnson and his credibility compared to Mr. Fisher. Because counsel's errors so clearly undermined his client's credibility, and similarly bolstered the credibility of the state's case and its witnesses, these errors undoubtedly had a particularly devastating impact on the defense.

The central role of credibility here and the otherwise thin nature of the state's case made the reasonable doubt theory an obvious avenue of defense and counsel's failure to pursue that defense the more harmful. In this regard, both parties assert that our decision in *Stouffer* resolves the question of prejudice in their favor. *See Stouffer II*, 214 F.3d at 1231. Mr. Fisher is correct that the attorney in that case committed many of the errors and omissions counsel here committed,[15] *Stouffer I*, 168 F.3d at 1162, and that we found prejudice, *Stouffer II*,

_____

[15] We held in *Stouffer I* that counsel failed to adequately prepare for trial, reinforced damaging testimony on cross-examination, failed to present an opening statement, ineptly examined his client, failed to present any semblance of a defense, and damaged defendant's own attempt to do so. *Stouffer v. Reynolds*, 168 F.3d 1155, 1162 (10th Cir. 1999).

214 F.3d 1231. The state contends correctly that in *Stouffer II* we found in part the defendant was prejudiced by his counsel's performance because defendant pointed to exonerating evidence counsel failed to present that might have created a reasonable doubt in the minds of the jurors, *id.* at 1234-35, while defendant here has not asserted a theory of innocence supported by new exonerating evidence.

The state's argument, that Mr. Fisher cannot demonstrate prejudice because he has not advanced a theory of innocence or new exculpatory evidence, fails because the right to counsel is not limited to those defendants who can produce exonerating evidence or prove their innocence. The state has read our *Stouffer* decisions too narrowly. The defendant there produced evidence supporting his *theory of defense* that counsel failed to present at trial. Counsel here similarly failed to present evidence and argument supporting a reasonable doubt theory. Mr. Fisher has amply demonstrated the availability of such evidence and this theory of defense, as well as his attorney's failure to competently assert this or any other theory of defense, consistent with the *Stouffer* decisions. Moreover, ineffective assistance is not limited to omissions of counsel; it also extends to cases in which counsel actively undermines his client's own defense. *See, e.g., Osborn*, 861 F.2d at 625-30; *Swanson*, 943 F.2d at 1075-76. Mr. Porter's conduct with regard to the pivotal issue of credibility similarly undermined a key aspect of the defense here.

More generally, based on several principles that are fundamental to the right to the assistance of counsel, we cannot conclude that just because defendant has not advanced a theory of innocence he *ipso facto* was afforded effective assistance of counsel.  First, constitutional due process requires that a criminal defendant's guilt be proved beyond a reasonable doubt.  "It is the duty of the Government to establish . . . guilt beyond a reasonable doubt.  This notion – basic in our law and rightly one of the boasts of a free society – is a requirement and a safeguard of due process of law in the historic, procedural content of 'due process.'"  *In re Winship*, 397 U.S. 358, 362 (1970) (quoting dissent in *Leland v. Oregon*, 343 U.S. 790, 802-03 (1952)).  Second, the right to counsel does not require a showing of actual innocence.  *Kimmelman,* 477 U.S. at 380.  Third, the Sixth Amendment commands that even where there is no defense theory available, counsel still has a duty to hold the state to its "heavy burden" to prove guilt beyond reasonable doubt.  *Cronic*, 466 U.S. at 657 n.19.

These principles together require that we not limit ineffective assistance to only those claims where defendant can demonstrate his innocence.  Because the right to counsel safeguards the right to a fair trial, and because a fair trial requires that a defendant's guilt be proven beyond a reasonable doubt, the right to effective assistance of counsel extends to those cases in which we lack confidence that the jury would have been convinced of defendant's guilt beyond a reasonable doubt had he been afforded adequate counsel.  *Strickland*, 466 U.S. at 694.  This

court's task is not to determine a defendant's guilt or innocence but to determine, with all due deference to the jury and the trial process itself, whether defendant was deprived of a fair trial.

This does not mean that a consideration of the evidence against defendant is irrelevant. In determining whether defendant was afforded a fair trial, and his guilt proven beyond a reasonable doubt, we consider all the evidence, including inculpatory evidence produced by the state. *Id.* at 695. This case is distinguishable from those in which we held that notwithstanding counsel's deficiency, the actual errors of counsel did not produce any reasonable probability that the outcome would have been different with adequate counsel because the evidence was overwhelming. *See, e.g.*, *Cooks v. Ward*, 165 F.3d 1283, 1293 (10th Cir. 1998) (finding no prejudice where defendant's confessions were corroborated by witnesses and evidence on intoxication would not have provided defense to the charge); *Houchin v. Zavaras*, 107 F.3d 1465, 1471-72 (10th Cir. 1997) (finding no prejudice where counsel was deficient for failing to present a "no intent" theory of defense, but evidence in record establishing intent was overwhelming and defendant failed to show the existence of evidence supporting "no intent" theory). Here, the failure to argue reasonable doubt was prejudicial precisely because the state did not present overwhelming evidence. The state was left with a case bolstered primarily by credibility. Defense counsel's conduct, which actively undermined his client's case in this regard, thus had a particularly devastating

-54-

impact.  Under these circumstances, we believe there is a reasonable probability the outcome of the trial would have differed if Mr. Fisher had had adequate counsel.  We therefore hold that Mr. Fisher was prejudiced by his attorney's shortcomings in the guilt phase.[16]

**Conclusion**

We **REVERSE** the judgment of the district court insofar as it denied habeas relief as to the guilt phase of Mr. Fisher's trial.  We grant the writ subject to the condition that the state retry Mr. Fisher within a reasonable time or be subject to further federal proceedings to consider his release.  *See Osborn*, 861 F.2d at 630-31.

---

[16] Mr. Fisher also contends he received ineffective assistance of counsel in the second stage of his trial.  The district court agreed, and the state cross-appeals this determination.  We need not reach this issue given our conclusion that Mr. Fisher was denied effective assistance of counsel in the guilt phase.