EBEL, Circuit Judge.
Cyril Wayne Ellis is a schizophrenic man who went on a ninety-minute killing spree that left three people dead and four wounded in Oklahoma in 1986. Ellis received three death sentences. This case comes to us on appeal from the district court’s denial of Ellis’s petition for habeas corpus under 28 U.S.C. § 2254. Ellis raises a host of claims in his habeas petition, most of them related to his mental illness.[1] *1203 We conclude that the trial court improperly excluded critical evidence of Ellis’s insanity in violation of Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and we reverse.
I. BACKGROUND

A. The shootings

The facts regarding the killings are undisputed. On January 26, 1986, Ellis argued with his fiancée Cheryl James and struck her. Later that day he felt remorseful and consumed an overdose of pills in an apparent suicide attempt. He was hospitalized and admitted to the psychiatric ward. Cheryl visited him at the psychiatric ward for several hours on January 29, and when she left he came running out after her and forced her to drive them away. Cheryl became afraid and found help, but when the police arrived she declined to press charges. Later that day, Ellis tried to buy a gun, discovered he did not have enough money, and borrowed a gun from one of the store clerks instead.
The next morning, Ellis was driving in his car when he noticed Cheryl riding in a car with her sister’s boyfriend, Robert Dumas. Ellis pulled alongside and Dumas pulled away. As Ellis sped after him, Dumas drove into a yard and Ellis blocked him in. Cheryl fled on foot, but Ellis stopped Dumas and ordered him into the trunk of the car. From inside, Dumas began pounding on the trunk, whereupon Ellis opened the trunk, said “I see you don’t want to live,” shot him twice, and closed the trunk. Dumas survived.
Ellis proceeded to Dumas’s house. Cheryl was not there, but Cheryl’s sister Teresa Thomas was there with Thomas’s six-year old daughter Tameca. Ellis chased Thomas through the house, shooting her repeatedly and fatally. He also shot Tameca three times, but she lived.
Ellis went home to get more ammunition, then went to his place of employment. Seeing employee Gordon Moore in the parking lot, Ellis ordered him to his knees and shot him in the face. Moore survived. Ellis went inside and shot and killed another employee, Carl Lake, with two shots. He stepped out to the loading dock, fired repeatedly, and killed James Rider. Ellis got into his car and began to drive away, shooting and injuring his final victim, Ancil Davis, on the way out.

B. Trial

Ellis was charged with capital murder. Prior to trial, the trial judge ordered that Ellis be examined by doctors at the Oklahoma department of mental health. The court stated that “there is a doubt as to the competency of the said CYRIL WAYNE ELLIS, by reason of the actions of the defendant and statements regarding the defendant’s ability to understand the proceedings against the defendant and the defendant’s capability of knowing right from wrong at the time these alleged actions took place.” In addition to questions clearly regarding competency to stand trial, the court also directed the doctors to address: “Was this person competent at the time these acts were alleged to have been committed?”
Pursuant to this order, Ellis was admitted to Eastern State Hospital on March 5, 1986 (roughly a month and a half after the shootings) and was seen until his re *1204 lease on April 2. Dr. R.D. Garcia,[2] Chief Forensic Psychiatrist at the hospital, prepared a discharge report. In this report, Dr. Garcia stated a final diagnosis of “Schizophrenia, paranoid type, chronic in complete remission spontaneously without any medication.”
Dr. Garcia’s report offered several relevant observations:
He had a severe dissociative disorder in the past with psychogenic headaches, and may have been completely depersonalized at the time of the incident. At least he claimed repeatedly, emphatically, without changing his viewpoint and report that he completely blocked out and did not remember the detail of the shooting....
His thought content on the mental status[3] revealed he was hearing voices, felt that no one cares about him, he might as well do away with himself, and he cannot trust people anymore. He was suspicious and paranoid. He felt his body was frozen by the demons and spirits trying to take over his body and his spirit. He began feeling that even the doctors were against him and he began talking and thinking about it since December of 1985....
.... Much, much improved spontaneously [upon discharge].... Only suicidal thoughts when he left. Competent in the psychological, legal, and sociological point of view at this time. He may have had history of schizophrenic or schizo-phreniform behavior in the past, in complete remission at the present time. He is definitely competent to stand trial at the present time, knowing right from wrong and capable of testifying in his defense.
Dr. Garcia died prior to trial and thus was unavailable to testify.
At the guilt phase of the trial, Ellis’s sole strategy was to argue that he was insane when he committed the murders. To this end, Ellis elicited testimony from several witnesses, none of them medical professionals, regarding events in the weeks prior to the shootings. Summarized in approximate chronological order, there was testimony that in the weeks immediately prior to the shooting Ellis passed out in the bathroom at work; was hospitalized for a head injury; suffered a seizure while driving; was hospitalized for a deliberate overdose of pills; was transferred to the psychological ward at the hospital the day before the shootings; told his sister he was hearing voices; escaped from the psychological ward and kidnaped his fiancée; was “in a daze,” “like I wasn’t even there talking to him,” “confused,” “sat there and stared directly at me, like straight through,” and “lost” after the confrontation with his fiancée and police the day before the shootings. In addition to this testimony, Ellis attempted also to introduce Dr. Garcia’s report into evidence, to which the prosecution objected only on grounds of relevancy and Rule 403. The trial court sustained the objection because the report “only goes as to his competency to stand trial, and his opinion does not go to the insanity at the time he committed the acts.”
*1205 In its closing argument, the prosecution argued that Ellis had failed to establish his insanity, emphasizing the lack of evidence from medical professionals:
We know that he was in the hospital. We know that he was in the psych ward, that he had voluntarily committed himself to that establishment. You have heard no evidence from any professional, nurse, doctor, of any sort, to say this man on that day did not know right from wrong.... I submit to you, folks, that you have heard absolutely no evidence, zero evidence, that this man did not know right from wrong on the day of that shooting.
Indeed, the prosecution argued forcefully that Ellis was faking insanity, stating, “This insanity defense that Mr. Ellis has brought to you is what I refer to as instant insanity. It’s like instant mashed potatoes.” Summarizing evidence that Ellis acted deliberately and understood events around him,[4] the prosecution concluded, “Again, instant insanity, insanity to his liking, insanity to justify these acts. That’s what he is doing, folks: ... He’s a con.” The defense waived closing argument.
The jury found Ellis guilty of all three counts of first degree murder and all four counts of shooting with intent to kill.
At the sentencing phase of the trial, Ellis offered additional testimony regarding his insanity from lay witnesses who believed Ellis had “a condition” and “deep emotional problems,” and who had heard Ellis threaten suicide. Ellis’s minister’s wife testified that in a Sunday prior to the shooting, Ellis stood up in church and wept, saying “this thing that’s in my mind is trying to get me to destroy myself ... I need help.” Ellis’s attorney then introduced the Garcia report that the court had excluded at the first phase. In addition, Ellis presented testimony from family and friends who cared about him and introduced evidence showing that he was active in his church, volunteered for children, helped a car-accident victim, had no prior felony convictions, and showed remorse when questioned by police. After the jury deliberated for over eighteen hours, Ellis received death sentences on each of the three murder counts and sentences of between 1,000 and 3,000 years on each of the shootings with intent to kill charges.
C. Appeal and post-conviction challenges
Ellis’s direct appeal was denied. Ellis v. State, 867 P.2d 1289 (Okla.Crim.App.1992). The Oklahoma Court of Criminal Appeals (OCCA) rejected Ellis’s argument that the Garcia report should have been admitted at the guilt phase, reasoning as follows:
Nothing in the Eastern State Hospital records was directed to the question of sanity, which is whether appellant was capable of knowing the wrongfulness of his acts when he committed them. See 21 O.S.1981, § 152(4). Rather, the examination was directed solely to the question of competency, i.e. whether appellant had the ability at the time of trial to understand the nature of the charges and proceedings brought against him, and was able to effectively and rationally assist in his defense. See 22 O.S.1981, § 1175.1. Appellant sought to introduce *1206 the records merely because they were authentic. Any probative value was substantially outweighed by the danger of misleading the jury and confusing the issues of competency and sanity, 12 O.S. 1981, § 2403, and we find that the trial court ruled properly.
Id. at 1296-97. Ellis’s subsequent petition for post-conviction reliéf was denied. Ellis v. State, 941 P.2d 527 (Okla.Crim.App.1997).
Ellis then filed the present habeas petition in federal district court, in which he again challenged, inter alia, the exclusion of the Garcia report. The district court rejected all of Ellis’s claims. Addressing Ellis’s Chambers claim regarding the exclusion of the Garcia report, the court adopted the OCCA’s reasoning in its entirety. It acknowledged in a footnote that the trial court directed the doctors to assess competency at the time the acts were committed, but stated that “[i]t is nevertheless clear that Dr. Garcia’s report and the accompanying staff notes are addressed to the issue of competency to stand trial, and not to the insanity defense.”
We have jurisdiction under 28 U.S.C. § 2253. Because Ellis filed his habeas petition on December 19, 1997, after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AED-PA), AEDPA applies.
II. CHAMBERS CLAIM
Ellis argues that the trial court’s exclusion of Dr. Garcia’s pre-trial diagnosis of schizophrenia denied him due process under Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and its progeny by preventing him from presenting his insanity defense. We agree.
In his brief to the OCCA on direct appeal, Ellis challenged the exclusion of the Garcia report on various grounds, including Chambers. The OCCA, however, upheld the exclusion without any reference to Ellis’s Chambers claim, holding only that the report properly was excluded under state law. Ellis v. State, 867 P.2d 1289, 1296-97 (Okla.Crim.App.1992) (concluding that, under 12 Okla. Stat. § 2403 (1981), the evidence properly was excluded because its probative value was substantially outweighed by the danger of confusing the jury). Because the OCCA did not consider Ellis’s federal constitutional claim, our review is de novo. Romano v. Gibson, 239 F.3d 1156, 1166 (10th Cir.2001) (reviewing de novo where “on direct appeal, [petitioners] did challenge the trial court’s exclusion of this evidence on federal constitutional grounds, [but] the [OCCA] addressed these claims only under state law”). However, the state court’s determination that nothing in the Garcia report was directed at the issue of sanity is entitled to deference under § 2254(d)(2). 28 U.S.C. § 2254(d)(2) (basing review on an “unreasonable determination of the facts in light of the evidence presented in the State court proceeding”).
We have stated that “state evidentiary determinations ordinarily do not present federal constitutional issues.... However, the Supreme Court, in, e.g., Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and Green v. Georgia, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (capital sentencing proceeding), has provided an exception, under some circumstances, if a state court applies the State’s evidentiary rules unfairly to prevent a defendant from presenting evidence that is critical to his defense.” Romano, 239 F.3d at 1166. “[T]o determine whether a defendant was unconstitutionally denied his or her right to present relevant evidence, we must balance the importance of the evidence to the *1207 defense against the interests the state has in excluding the evidence.” Richmond v. Embry, 122 F.3d 866, 872 (10th Cir.1997). Further:
[T]o establish a violation of ... due process, a defendant must show a denial of fundamental fairness.... It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial. Evidence is material if its suppression might have affected the outcome. In other words, material evidence is that which is exculpatory — evidence that if admitted would create reasonable doubt that did not exist without the evidence.
Richmond, 122 F.3d at 872 (citations and internal quotation marks omitted). See also Romano, 239 F.3d at 1168 (“[W]e need ask no more than whether the trial court’s application of this state evidentiary rule excluded critical exculpatory evidence.”).
We conclude that the OCCA unreasonably determined the facts in light of the evidence presented when it concluded that the Garcia report did not bear upon Ellis’s sanity at the time of the incident. The report was prepared in response to the trial court’s specific request for an assessment of Ellis’s competency at the time of the shootings, i.e. legal sanity. The report diagnosed Ellis as paranoid schizophrenic. It classified his paranoid schizophrenia as “chronic,” a term defined in the then-current Diagnostic and Statistical Manual of Mental Disorders (3d ed.-Itev.1987) (DSM-III-R) as having shown signs of the mental disturbance more or less continuously for more than two years. The report stated that Ellis “had a severe dissociative disorder in the past” and he “may have been completely depersonalized at the time of the incident.” The report observed that at the time of the initial status report, Ellis revealed he was hearing voices, and that he “felt his body was frozen by the demons and spirits trying to take over his body.” We cannot agree that “[njothing” in the report “was directed to the question of sanity.” Ellis, 867 P.2d at 1296.
Moreover, we conclude that the Garcia report was exculpatory — and thus implicated the fundamental fairness of the trial — because it would have “create[d] reasonable doubt that did not exist without” it. Richmond, 122 F.3d at 872. With Dr. Garcia’s diagnosis and observations excluded during the guilt phase, Ellis’s case for insanity was highly vulnerable to the argument, seized upon by the prosecution in its closing argument as quoted above, that Ellis only began faking mental illness around the time of the killings. The prosecution emphasized during the guilt phase that Ellis introduced no diagnosis of insanity and no testimony of medical professionals that he was insane. See also Mem. Op. & Order at 46-47 (stating that insanity evidence presented during guilt phase “does not establish that either his alleged head injury, his emotional state, or any mental illness from which he suffered at the time of the shooting were so severe as to prevent him. from understanding the nature and consequences of his acts, or from knowing that they were wrong” and “[t]he evidence was clearly not sufficient to enable a reasonable jury to find the Petitioner not guilty by reason of insanity”). The Garcia report would have provided the jury with objective, professional validation of Ellis’s longstanding mental illness, validation provided by the Eastern State Hospital’s chief forensic pathologist based on extended observation. It is reasonably probable that the Garcia report would have put Ellis’s other evidence of mental illness in an altogether different light to the jury.
*1208 We reject the district court’s conclusion that the value of the Garcia report to the defense was outweighed by the danger of misleading the jury and confusing the issues of competency and sanity. We note that the jury could have been instructed on the difference and ordered not to blur the two, and “[a] jury is presumed to follow its instructions.” Weeks v. Angelone, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000). More significantly, under the circumstances any meaningful risk of confusion weighed entirely against Ellis. The Garcia report tended to show that Ellis was insane at the time of the crime but was competent now to stand trial. If, as the OCCA and the district court posit, the jury was irremediably likely to be unable to distinguish sanity from competency, their confusion could only lead them to conclude that Ellis was sane then because he is competent now. In theory, of course, the jury could mistakenly conclude that Ellis is incompetent now because he was insane then, but such a conclusion would have .been altogether irrelevant: the competency issue was not before the jury because it already had been resolved by the court prior to trial. Thus, even if we were to assume that an instruction could not cure the risk of confusion regarding competency and sanity, it is clear that Ellis alone bore that risk. The state’s interest in excluding the Garcia report clearly was outweighed by Ellis’s interest in presenting it.
Accordingly, we conclude that Ellis’s due process right to present evidence critical to his defense was violated by the trial court’s exclusion of the Garcia report during the guilt phase of the trial.
III. CONCLUSION
We REVERSE the judgment of the district court insofar as it denied habeas relief as to the guilt phase of Ellis’s trial. We grant the writ subject to the condition that the state retry Ellis within a reasonable time or be subject to further federal proceedings to consider his release. See Fisher v. Gibson, 282 F.3d 1283, 1311 (10th Cir.2002).

. Ellis asserts six grounds for reversal of the district court’s denial of habeas relief. First, he argues that his trial counsel was ineffective under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for failing to discover evidence that Ellis had been diagnosed as schizophrenic only weeks before the incident, as well as other mitigating evidence regarding his life history (and that appellate counsel was ineffective for failing to raise this issue). Second, he argues that he was wrongly denied the opportunity to voir dire potential jurors individually, outside the presence of the rest of the venire, regarding their views on the death penally. Third, he challenges the insanity instruction given at trial. Fourth, he argues that the exclusion of evidence of a pre-trial psychiatric examination resulting in a schizophrenia diagnosis prevented him from presenting his defense in violation of Chambers v. Mississippi. Fifth, he argues that the trial court violated Cooper *1203 v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), by applying an unconstitutional burden of proof for competency. Sixth and finally, he argues that under Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), he cannot be executed because he is insane. Because we conclude below that Ellis is entitled to habeas relief on the fourth issue, we do not reach his remaining claims.

. Dr. Garcia, we have noted, "was himself suffering from severe untreated bipolar disorder” during this time. Williamson v. Ward, 110 F.3d 1508, 1519 (10th Cir.1997). Neither party to the present appeal argues that his conclusions (some of them favorable to Ellis, some favorable to the State) should be deemed unreliable.

. This refers to the status obtained near the beginning of the mental evaluation.

. Representative of the prosecution’s summary is the following:
Then the voice leaves him, and I guess he runs around the back of the house to see what is happening. Then the voice comes back again, and he runs over and he shoots Teresa three or four more times.
The voice leaves. Then he sees Tameca; and the voice comes back, and he shoots Tameca. That’s the way his insanity is working, folks.