**F I L E D**

PUBLISH

**APR 11 2003**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TYRONE P. DARKS,

          Petitioner-Appellee,

v.

MIKE MULLIN, [*] Warden,
Oklahoma State Penitentiary,

          Respondent-Appellant.

No. 01-6308

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-98-538-L)**

---

Robert L. Whittaker, Assistant Attorney General, Criminal Division, Oklahoma City, Oklahoma, (W.A. Drew Edmondson, Attorney General of Oklahoma, with him on the briefs), for Respondent-Appellant.

K. Leslie Delk, Tucson, Arizona, for Petitioner-Appellee.

---

Before **SEYMOUR**, **BALDOCK**, and **KELLY**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

[*]    Mike Mullin replaced Gary Gibson as Warden of the Oklahoma State Penitentiary effective March 25, 2002.

Petitioner Tyrone Peter Darks was convicted of the first degree murder of his former wife Sherry Goodlow and sentenced to death in Oklahoma state court. The Oklahoma Court of Criminal Appeals (OCCA) affirmed the conviction and sentence, *see Darks v. State*, 954 P.2d 152 (Okla. Crim. App. 1998), and denied post-conviction relief, *see Darks v. State*, 954 P.2d 169 (Okla. Crim. App. 1998). On federal habeas review, the district court granted Mr. Darks relief from both the conviction and the sentence. The court held that the trial court had violated *Beck v. Alabama*, 447 U.S. 625 (1980), by failing to instruct on first degree manslaughter as a lesser included offense of capital murder, and had unconstitutionally coerced the death verdict by giving the jury a supplemental instruction. The court also held that cumulative error had unconstitutionally affected the entire proceedings. The State appeals.[1] Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, we reverse the grant of habeas relief on both the conviction and sentence.

---

[1] A certificate of appealability is not required for the State to appeal from the district court's order granting relief. *Hooper v. Mullin*, 314 F.3d 1162, 1166 n.2 (10th Cir. 2002) (citing Fed. R. App. P. 22(b)(3)).

**I.**

The following evidence was presented during the guilt phase of Mr. Darks' trial. On August 7, 1994, the day of her death, Ms. Goodlow went to church with Scott, her two-year old son by Mr. Darks. After the service, Ms. Goodlow and Scott, along with a friend and the friend's sister-in-law, went to the grocery store and made purchases at 2:19 p.m. Ms. Goodlow declined her friend's invitation for dinner, saying she wanted to go home.

At 2:52 p.m., Ms. Goodlow made a 911 call from a pay phone, claiming Mr. Darks had run her off the road and taken their son. The dispatcher advised her a police officer would meet her at Mr. Darks' house. At 3:09 p.m., Ms. Goodlow made a second 911 call asking about the officer and was told there had been a delay. At 3:27 p.m., Sergeant Ken Davis arrived at Mr. Darks' house. Ms. Goodlow was not there, and Mr. Darks' mother indicated she had not seen Ms. Goodlow that day.

About that time Jamey Harrison, who lived near Draper Lake, noticed a car, later identified as that of Mr. Darks, drive into his driveway and then back out. Mr. Harrison also saw a small white car stopped at a nearby intersection. When the white car pulled away quickly, Mr. Darks' car followed it. Ten to fifteen minutes later, Mr. Harrison heard what sounded like firecrackers exploding, coming from the direction of Draper Lake.

Mark Folks was working in his home shop in the same area when he heard his dogs barking. Upon investigating, he saw a white Mustang driven by a woman parked in his driveway at the gate. As he began to walk toward the car, the woman backed out and drove away. He could hear her screaming, so he followed her in his pickup. Eventually, he saw tire tracks in the grass leading from the road into the brush. Following the tracks, he discovered the Mustang with its flashers on and the engine running. When he did not see anyone and no one responded to his calls, he returned home and telephoned 911. Returning to the white car a second time, he called out again but received no response. He then went to the home of his neighbor Sherry Heinken to telephone her husband, a police officer. Mr. Folks and Ms. Heinken went back to the car and found Ms. Goodlow, lying across the seat. She had been shot several times.

After receiving a call at 3:55 p.m., police officers proceeded to the crime scene. When the police determined that the deceased woman was Ms. Goodlow, an officer went to the Darks home to check on Scott and to talk to anyone who might know Ms. Goodlow. Mr. Darks was home. He told the officer that Ms. Goodlow had called him at 2:30 p.m. and asked him to pick up their son, which he did about 3:00 p.m. and then returned home. At 4:00 p.m., Ms. Goodlow came to his house asking for money, which he gave her, and she left. He went to the mall with his son at 4:30 p.m. and to his girlfriend's house at 5:30 p.m.

Mr. Darks agreed to go to the police station for further questioning, where he gave approximately the same story and claimed Ms. Goodlow could not have called 911. Mr. Darks denied killing Ms. Goodlow, but stated she had gotten what she deserved and what goes around comes around. Mr. Darks informed police detectives that they could not place him at the scene of the murder and that they had no gun or fingerprints. During the interview, the police arrested Mr. Darks.

After his arrest, and while incarcerated in a cell with Richard Maytubby and others, Mr. Darks said that he had killed his girlfriend. He told Mr. Maytubby that as she was coming from church, he had taken his son from her and put the boy into his car. She had followed him to Draper Lake, where he had shot her twice in the head and three or four times in the back with a .38 caliber gun. The police investigation revealed that Ms. Goodlow, who was still wearing her seatbelt, had been shot four times at close range–twice in the head, once in the back and once in the arm–with a .38 caliber gun through the open window of her car.

Although Mr. Darks' mother testified that Mr. Darks and Ms. Goodlow were on good terms and that Ms. Goodlow would leave Scott with her and Mr. Darks, Ms. Goodlow's father testified that the court had taken away Mr. Darks' visitation rights. It was undisputed that the two had an ongoing hostile

relationship. Two days before the murder, Mr. Darks had called Mr. Goodlow and told him Ms. Goodlow should "get her insurance papers up to date because he's going to put a cap in her." Tr. vol. V at 898. Mr. Goodlow explained at trial he believed this meant Mr. Darks was going to kill his daughter. Five minutes after making the call, Mr. Darks drove by the Goodlow home. Ms. Goodlow had expressed fear of Mr. Darks and bad feelings toward him before her death. The jury rejected Mr. Darks' alibi defense, and found him guilty of first degree murder.

During the sentencing stage, the State's evidence elaborated upon the acrimonious love/hate relationship between Ms. Goodlow and Mr. Darks. A store clerk testified about an incident in which Mr. Darks came up behind Ms. Goodlow and grabbed her neck while she was walking in the mall pushing Scott in a baby stroller. Mr. Darks released Ms. Goodlow and then tried to pull Scott from the stroller, while Ms. Goodlow pleaded for him not to take the child. A police officer took Mr. Darks into custody after the store clerk called security. At that time, Mr. Darks maintained that Ms. Goodlow had hit him first and that he wished to press charges.

Sergeant Aven Bull testified he had gone to Ms. Goodlow's house two or three times after Mr. Darks reported she was abusing their son. However, Sergeant Bull had found no evidence of child abuse by Ms. Goodlow. From 1992

on, a series of police reports concerned both Ms. Goodlow and Mr. Darks. Typically, charges were filed against him but not against her. From January to June 1994, police arrested Mr. Darks with increasing frequency. Evidence indicated he had broken the front and back windows on Ms. Goodlow's car, and had spray painted her mother's new car and later called her mother to ask if she had enjoyed removing the paint.

Mr. Darks' mother and sisters testified in mitigation that Ms. Goodlow and Mr. Darks had a stormy relationship, marked by mutual arguments, harassments, jealousies and aggression. Ms. Goodlow had smashed the windshield of Mr. Darks' car, broken off his rearview mirror, poured motor oil and Jell-O over his car, and run into it. Mr. Darks' family members, however, had taken Ms. Goodlow's side in order to prevent the police from arresting her. Additional mitigating evidence indicated that Mr. Darks was educated, could provide assistance to others and encourage their educational pursuits, was a good and loving father, was a loving and supportive brother and son, could share his faith in God and prayer with others, and had a history of aggression only with respect to Ms. Goodlow.

Based on the first and second stage evidence, the jury found as an aggravating factor that Mr. Darks would be a continuing threat to society, but did not find that the murder was committed to avoid lawful arrest or prosecution.

Deciding that the continuing threat aggravator outweighed the mitigating evidence, the jury assessed a death sentence.

**II.**

The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to this appeal. Under AEDPA, if a claim is adjudicated on the merits in state court, a petitioner is entitled to federal habeas relief only if he can establish that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). AEDPA also requires federal courts to presume state court factual findings to be correct, and places the burden on the petitioner to rebut that presumption by clear and convincing evidence. *Id.* § 2254(e)(1). If the state court did not decide a claim on the merits, we review the district court's legal conclusions *de novo* and its factual findings, if any, for clear error. *Hooper v. Mullin*, 314 F.3d 1162, 1167 (10th Cir. 2002). We apply these standards to assess whether the district court correctly analyzed each of the issues.

## III.

### A. Lesser Included Offense Instruction

The federal district court held that Mr. Darks was entitled to habeas relief from his conviction because the trial court violated *Beck v. Alabama*, 447 U.S. 625 (1980), by failing to instruct on the lesser included offense of first degree manslaughter. On appeal, the State argues that Mr. Darks' constitutional rights were not violated by the trial court's failure to give the instruction because manslaughter is not a lesser included offense of first degree murder under *Beck* and, alternatively, because the evidence was insufficient to support a manslaughter instruction.

#### 1. Request for an Instruction

As a threshold issue, we must determine whether Mr. Darks requested a first degree manslaughter instruction. Failure to request such an instruction precludes a petitioner seeking habeas relief from prevailing on a *Beck* claim. *Hogan v. Gibson*, 197 F.3d 1297, 1303 n.3 (10th Cir. 1999); *Hooks v. Ward*, 184 F.3d 1206, 1234 (10th Cir. 1999).

Neither the transcript nor the original record indicates that Mr. Darks requested a first degree manslaughter instruction. At the federal evidentiary hearing, however, Mr. Darks' trial counsel asserted that she had asked for a heat of passion manslaughter instruction but the request was overruled because

Mr. Darks' defense was that he did not commit the crime. Evid. Hr'g Tr. at 6-8 (Sept. 22, 2000). Based on counsel's uncontroverted testimony, and because everyone assumed that part of the trial court's instructional conference had not been transcribed, *see id.* at 5-6, the district court decided counsel had asked for a manslaughter instruction and Mr. Darks' claim could be decided on its merits.

The State does not challenge the testimony of Mr. Darks' trial counsel, nor does it contend on appeal that the district court erred in finding she had requested a manslaughter instruction. The state court did not reach this question, and we therefore review the federal district court's factual finding for clear error. *See Hooper*, 314 F.3d at 1167. We have no reason to question the district court's finding and we proceed to the merits of the State's arguments.

## 2. Whether Manslaughter Is a Lesser Included Offense

The State argues for the first time on appeal that "while a state may allow an instruction on a lesser offense under state law, the same instruction is not necessarily mandated by due process under *Beck*." Aplt. Br. at 19. The State contends that the "elements test," an interpretation of Federal Rule of Criminal Procedure 31(c) requiring that all elements of a lesser included offense be elements of the charged offense, applies to *Beck* claims, and that under this test first degree manslaughter is not a necessarily included offense of first degree murder. To support its argument, the State cites *Schmuck v. United States*,

489 U.S. 705, 715-16 (1989) (adopting "elements test" to interpret Fed. R. Crim. P. 31(c), which permits defendant to be found guilty of offense "necessarily included" in offense charged), and OKLA. STAT. tit. 22, § 916 (using language similar to Rule 31(c)).

While we do not ordinarily consider arguments raised for the first time in this court, *see Rojem v. Gibson*, 245 F.3d 1130, 1141 (10th Cir. 2001), the argument is without merit in any event. The State relies on the Supreme Court's use in *Beck* of the single word "element," and in so doing takes the word out of context. The Court there was not addressing the "elements test" for determining whether a crime is a lesser included offense; rather, the Court was pointing out the risk of failing to provide a lesser included offense instruction in a capital case. *See Beck*, 447 U.S. at 637. [2] The Court's subsequent discussion in *Hopkins v. Reeves*, 524 U.S. 88, 96-98 & n.6 (1998), leaves no doubt that the availability

---

[2]     The discussion in which the word "element" was used was as follows:
        While we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural safeguard. That safeguard would seem to be especially important in a case such as this. For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
*Beck v. Alabama*, 447 U.S. 625, 637 (1980).

of a lesser included offense instruction in a state criminal trial is a matter of state law. The elements test from *Schmuck* is therefore inapplicable to this case.

Moreover, the State does not cite persuasive Oklahoma authority suggesting that manslaughter is not a lesser included offense of first degree murder under state law. Oklahoma consistently has treated first degree manslaughter as a lesser included offense of first degree murder. *See*, *e.g.*, *Hogan*, 197 F.3d at 1303-04 (citing state and federal cases); *Boyd v. Ward*, 179 F.3d 904, 917 (10th Cir. 1999) (citing *Lewis v. State*, 970 P.2d 1158, 1165-66 (Okla. Crim. App. 1999)); *see also, e.g., Lewis*, 970 P.2d at 1165 (treating manslaughter as lesser included offense of first degree murder, but rejecting claim that second degree murder is lesser included offense of first degree murder); *Turrentine v. State*, 965 P.2d 955, 969 (Okla. Crim. App. 1998) (same). [3] Accordingly, we reject the State's

---

[3]    In *Shrum v. State*, 991 P.2d 1032, 1033 (Okla. Crim. App. 1999), decided after Darks' direct appeal, the OCCA for the first time explicitly addressed whether first degree heat of passion manslaughter is "necessarily included" within premeditated murder and therefore a lesser included offense of first degree malice murder. *Shrum* recognized that "[u]nder the strict statutory elements test first degree heat of passion manslaughter is not a lesser included offense of first degree malice murder." *Id.* at 1035 n.5. *Shrum* nevertheless rejected using the elements test to decide what constitutes a lesser included offense and adopted, prospectively, an evidence test under which "all lesser forms of homicide are necessarily included and instructions on lesser forms of homicide should be administered if they are supported by the evidence." *Id.* at 1036 (recognizing inconsistency in its prior approach to lesser included offenses, but citing no case indicating first degree manslaughter is not lesser included offense of first degree murder); *see also Gilson v. State*, 8 P.3d 883, 917 (Okla. Crim. App. 2000).

argument.

### 3. Sufficiency of the Evidence for a Manslaughter Instruction

Under *Beck*, "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. at 627. "[T]he purpose of the rule 'is to eliminate the distortion of the fact-finding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.'" *Hogan*, 197 F.3d at 1303 (quoting *Spaziano v. Florida*, 468 U.S. 447, 455 (1984)). Due process thus requires that a state court give a lesser included offense instruction if the evidence would support a conviction on that offense. *Hopper v. Evans*, 456 U.S. 605, 609, 611 (1982) (citing *Beck*). In this case, the trial court erred in refusing to give a lesser included offense instruction only if the evidence would have permitted the jury to find Mr. Darks guilty of first degree manslaughter and to acquit him of first degree murder. *See Hogan*, 197 F.3d at 1305.

The OCCA held the evidence did not support giving a heat of passion manslaughter instruction.

> This Court has repeatedly held that an instruction on a lesser included offense need only be given when there is evidence that tends to prove the lesser included offense was committed. Absent such evidence, an instruction should not be given. . . . Heat of

-13-

Passion Manslaughter . . . include[s] . . . a showing that there was no premeditated design to effect death.[ [4] ]  Here, Appellant shot the decedent four times at close range in vital areas of her body:  twice to the head and twice to the trunk of her body.  As such, the trial court properly did not instruct on First Degree Manslaughter.

*Darks*, 954 P.2d at 161 (citation omitted).  The question under *Beck*, however, is whether there was sufficient evidence to warrant instructing the jury on the lesser included offense, not whether there was sufficient evidence to support the first degree murder conviction.  *See Hogan*, 197 F.3d at 1305-06.  We have held that a "state appellate court's original conclusion on direct appeal that a manslaughter instruction was not necessary because there was 'sufficient evidence' to support a finding of premeditation in the trial record is squarely contrary to the holding in *Beck*."  *Id.* at 1305.  Because the OCCA did not address the proper question and adjudicate whether there was sufficient evidence to warrant a manslaughter instruction, we owe no deference to the OCCA decision.  *See id.* at 1306.

The federal district court did address the proper question in determining whether the evidence warranted giving a manslaughter instruction and asked whether a rational jury could have convicted Mr. Darks of manslaughter and

---

[4]     There is a distinction between lack of premeditation and intent to kill. "[U]nder Oklahoma law heat of passion manslaughter does not require a lack of intent to kill."  *Valdez v. Ward*, 219 F.3d 1222, 1243 (10th Cir. 2000) (citing *Le v. State*, 947 P.2d 535, 546 (Okla. Crim. App. 1997); *Hooks v. Ward*, 184 F.3d 1206, 1232 (10th Cir. 1999); *Hogan v. Gibson*, 197 F.3d 1297, 1305 n.5 (10th Cir. 1999)).

acquitted him of first degree murder. *See Mitchell v. Gibson*, 262 F.3d 1036, 1050 (10th Cir. 2001). In doing so, the court held that Mr. Darks was entitled to a heat of passion manslaughter instruction for the following reasons: Mr. Darks and Ms. Goodlow had an acrimonious relationship with a long history of confrontations; on the day of the homicide they were in the midst of another confrontation regarding their son; a car chase occurred near the scene of the murder; Mr. Darks appeared agitated; the investigating officers believed Ms. Goodlow's death resulted from an out-of-control confrontation between Mr. Darks and Ms. Goodlow; and the trial judge's report questioned, due to the lack of facts in the record, when Mr. Darks actually formed the intent to murder Ms. Goodlow. [5] Based on our review of the relevant law and the facts, we conclude, contrary to the district court, that this evidence did not warrant an instruction on first degree manslaughter. [6]

In Oklahoma, a person commits first degree manslaughter if the murder is "perpetrated without a design to effect death, and in a heat of passion, but in a

---

[5] Oklahoma law requires that when the death penalty is imposed, the trial court must prepare a report to be transmitted to the OCCA along with the entire record and transcript. *See* OKLA. STAT. tit. 21, § 701.13; OKLA. CT. CRIM. APP. R. 9.2(D) (2003). The report must be in the form set out by the OCCA. *See* OKLA. CT. CRIM. APP. R. 13.0, Form 13.12 (2003).

[6] We need not decide whether the sufficiency of the evidence to support this lesser included offense instruction is a factual or a legal determination. In either event, there was insufficient evidence to merit the instruction. *See Valdez*, 219 F.3d at 1242.

cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide." OKLA. STAT. tit. 21, § 711(2). "The elements of heat of passion are 1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage or resentment; 3) homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool; and 4) a causal connection between the provocation, passion and homicide." *Charm v. State*, 924 P.2d 754, 760 (Okla. Crim. App. 1996). Adequate provocation is "any improper conduct of the deceased toward the defendant which naturally or reasonably would have the effect of arousing a sudden heat of passion within a reasonable person in the position of the defendant." *Washington v. State*, 989 P.2d 960, 968 n.4 (Okla. Crim. App. 1999). Adequate provocation is measured by an objective test of reasonableness. *Bland v. State*, 4 P.3d 702, 715 (Okla. Crim. App. 2000).

The State argues, and Mr. Darks' attorney was forced to concede at oral argument, that no evidence supports the adequate provocation element. Nothing in the record shows Ms. Goodlow acted improperly toward Mr. Darks immediately prior to her murder. *Cf. Hooker v. Mullin*, 293 F.3d 1232, 1239 (10th Cir. 2002) (noting no evidence indicated victims did anything to provoke petitioner), *cert. denied*, 123 S. Ct. 975 (2003). Rather, the evidence indicates that after Ms. Goodlow left the grocery store, Mr. Darks ran her off the road and

-16-

took their son. At the time he shot her, her gearshift was in drive and she was sitting in the car with her foot on the brake. Mr. Darks did not indicate that Ms. Goodlow had engaged in provoking behavior either in his videotaped statement, which was played for the jury, or in his confession to Mr. Maytubby. Although the detectives indicated their belief during Mr. Darks' videotaped statement that the murder occurred after an out-of-control conflict, there is no evidence to support their surmise. The trial court specifically admonished the jury that the detectives' comments during the videotaped statement were not part of the evidence. Contrary to Mr. Darks' contention, the trial court expressed the view in its capital felony report that the evidence did not establish provocation by Ms. Goodlow. The court noted

> I feel the jury's determination of the death sentence was appropriate in this case, as I believe it to be based upon evidence that indicates a premeditated and planned homicide that involved this defendant luring, in some fashion, the victim from the Midwest City area out to Lake Draper to commit the murder. There is some question as to when this defendant actually formed the intent to murder the victim that could involve facts that are not in evidence having to do with arguments and discussions concerning custody of the child that he and the victim had during this series of events that could indicate heat of passion type homicide. No evidence exists to support this, only inference.

Original Record (O.R.) at 402. Viewing the totality of the evidence presented at trial, any inference of provocation is mere speculation and therefore insufficient

-17-

to establish the adequate provocation needed to support heat of passion manslaughter. [7]

The federal district court relied on the acrimonious relationship between Ms. Goodlow and Mr. Darks and their confrontation on the day of the murder in finding sufficient evidence. The evidence did establish that the two had a prior history of turbulence and harassment. Each had obtained a Victim Protective Order against the other, and each repeatedly had accused the other of violating the orders, often seeking police support in doing so. Mr. Darks had been arrested numerous times for violating Ms. Goodlow's protective order and both had fought for custody of their son. While this evidence may show that Mr. Darks acted with passion or emotion, it alone is insufficient to satisfy the adequate provocation requirement because none of this occurred contemporaneously with the murder. Mr. Darks cites no Oklahoma law, nor have we found any, indicating that such non-contemporaneous evidence would satisfy the provocation element of heat of passion manslaughter.

Because the record is devoid of evidence of the adequate provocation needed to support an instruction on heat of passion manslaughter, the district court erred in granting habeas relief on this claim.

---

[7] We note that in deciding the evidence was sufficient to support a finding of the continuing threat aggravator, the OCCA noted there was no evidence of provocation by Ms. Goodlow. *Darks*, 954 P.2d at 164 n.7.

-18-

**B. Coerced Jury Verdict**

The State also contends the district court erred in holding that the trial court gave a coercive supplemental jury instruction during second stage deliberations. *See generally Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988) ("Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body.").

The jury began second stage deliberations in midafternoon. Four hours and forty minutes later, the trial court *sua sponte* called the jury into the courtroom, commented the jury had been deliberating for "a reasonable time"/"a good deal of time" and asked the foreperson to report the jury's numerical division without stating the punishments reflected in that division. Tr. vol. VIII at 1559. The jury was divided eleven to one. The trial court then gave this instruction:

> Ladies and gentlemen of the jury, you have advised me through your foreperson that you have not reached a unanimous verdict as to punishment. I am going to ask you to deliberate further. You are advised that if upon further deliberation you are unable to agree unanimously as to a punishment recommendation, I shall discharge you, and according to law, I must impose either a sentence of life or a sentence of life without parole. You are excused at this time back into [the bailiff's] charge for further deliberations.

*Id.* at 1560; *see also Darks*, 954 P.2d at 165 (noting language in last sentence is contained in Oklahoma Jury Instruction 442 and "tracks" OKLA. STAT. tit. 21, § 701.11). Mr. Darks did not object to this supplemental instruction. Twenty minutes later, the jury returned a unanimous verdict of death.

### 1.  Standard of Review

Although Mr. Darks argued on direct appeal that the trial court's allegedly coercive supplemental instruction violated his constitutional rights, the OCCA decided this issue on state law grounds only, determining the trial judge gave the supplemental instruction after the jury had exceeded a reasonable time for reaching a punishment decision.     *Darks*, 954 P.2d at 166.  Notwithstanding the OCCA's failure to address Mr. Darks' constitutional claims, the State argues AEDPA still applies in light of that court's resolution of the claim on the merits. The State contends the OCCA's adjudication is an implied rejection of the merits of the constitutional claim and therefore is entitled to some deference under AEDPA. [8]

We agree with the district court that there is no state court decision to which deference is due.  "[W]here a federal constitutional argument was raised on direct appeal but not addressed by the state court in any manner, we review that argument *de novo*."  *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (per

---

[8]     To support this argument, the State cites     *Hurtado v. Tucker*, 245 F.3d 7, 20 (1st Cir. 2001).   *Hurtado* is inapplicable.  In that case, the state appellate court adjudicated the constitutional claims on the merits.  Consequently, the First Circuit did not decide how to analyze whether there had been an unreasonable application of Supreme Court precedent when there was no state court analysis of the claims.   *Id.* at 18 n.18.  Moreover, the court indicated in dicta that a state court's failure to discuss a constitutional claim may mean the state court did not adjudicate the claim on its merits.     *Id.*

curiam); *see Ellis v. Mullin*, 312 F.3d 1201, 1206 (10th Cir. 2002) ("Because the OCCA did not consider [petitioner's] federal constitutional claim, our review is *de novo*."); *Neill v. Gibson*, 278 F.3d 1044, 1053 (10th Cir. 2001) (reviewing *de novo* where state court denied claim on state ground unrelated to federal issue), *cert. denied*, 123 S. Ct. 145 (2002); *Romano v. Gibson*, 239 F.3d 1156, 1166 (10th Cir. 2001) (reviewing *de novo* where petitioners' challenge on direct appeal was based on federal constitutional grounds, but OCCA addressed claims only under state law).

## 2. Merits

In *Allen v. United States*, 164 U.S. 492 (1896), the Supreme Court upheld the giving of a supplemental instruction to a jury unable to reach a consensus. The instruction at issue in *Allen* directed those jurors holding minority views to reconsider their views in light of the contrary views held by the majority of jurors, but stated that the verdict must be that of each individual juror. *See id.* at 501; *see also Lowenfield*, 484 U.S. at 237-38 & n.1 (citing *Allen* and again approving use of supplemental jury charge when jury is deadlocked). The *Allen* instruction's purpose is

> "to encourage unanimity (without infringement upon the conscientious views of each individual juror) by urging each juror to review and reconsider the evidence in the light of the views expressed by other jurors, in a manner evincing a conscientious search for truth rather than a dogged determination to have one's way in the outcome of the deliberative process."

-21-

*Gilbert v. Mullin*, 302 F.3d 1166, 1173 (10th Cir. 2002) (quoting *United States v. Smith*, 857 F.2d 682, 683-84 (10th Cir. 1988)), *petition for cert filed*, (U.S. Feb. 27, 2003) (No. 02-9334); *see also United States v. McElhiney*, 275 F.3d 928, 935 (10th Cir. 2001) ("An *Allen* instruction is, in effect, a charge given by a trial court that encourages the jury to reach a unanimous verdict so as to avoid a mistrial.").

The supplemental instruction here is somewhat different than a traditional *Allen* charge, and we must decide whether it improperly coerced a jury verdict. *Lowenfield* and other federal cases addressing an *Allen* charge provide an instructive framework for determining whether the instruction was impermissibly coercive. *Cf. McElhiney*, 275 F.3d at 941 ("[E]ven if the district court's comments did not constitute an instruction (*Allen* or otherwise), its remarks still had the potential to coerce the jury, and, as coercion is the primary concern with the giving of an *Allen* instruction, the overall *Allen* analysis would still be applicable."). In conducting this analysis, we are mindful that "[w]hether a jury has been improperly coerced by a judge is a mixed question of law and fact." *Gilbert*, 302 F.3d at 1171.

In deciding whether a supplemental instruction is coercive, "the Supreme Court has held that a reviewing court must look at the supplemental charge given by the judge 'in its context and under all the circumstances.'" *Id.* at 1173

(quoting *Lowenfield*, 484 U.S. at 237 (quotation omitted)); *see also McElhiney*, 275 F.3d at 941 (examining trial court's comments under all circumstances to decide if jury's verdict was product of impermissible coercion). Factors reviewing courts consider in making a coercion determination include: "'(1) the language of the instruction, (2) whether the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury's subsequent deliberations.'" *Gilbert*, 302 F.3d at 1173 (quoting *United States v. Arney*, 248 F.3d 984, 988 (10th Cir. 2001)); *see also United States v. Porter*, 881 F.2d 878, 888 (10th Cir. 1989) (considering, in addition to first three factors listed above, whether trial court gave instruction before jury reached deadlock).

The district court considered the following circumstances in deciding that the second stage verdict in this case was influenced by the coercive action of the trial court. The second stage lasted no more than five and a half hours. The jury had deliberated for four and a half hours, and was still deliberating when the trial court *sua sponte* called it into the courtroom and asked about its numerical division. Moreover, the jury had not indicated it was deadlocked, and had earlier asked a question indicating it was leaning toward a sentence of life without parole. The district court also pointed out that the supplemental instruction did not urge the minority to consider the majority's views and instead informed the jury of the consequences of an inability to reach a unanimous verdict, thereby

-23-

suggesting the jury could avoid its duty to decide a sentence. Finally, less than twenty minutes after the polling, the jury returned a verdict.

Upon *de novo* review of the totality of the circumstances, we conclude to the contrary that the supplemental instruction did not coerce a death sentence. First, nothing in the language of the supplemental instruction itself can be deemed coercive. Although it lacked protective language assuring minority jurors they were not required to relinquish firmly held convictions, it did not include any language asking the jurors to reconsider their positions and to change their positions if they believed they were wrong. *See Montoya v. Scott*, 65 F.3d 405, 414 (5th Cir. 1995). The instruction did not press the hold-out juror to yield to the majority position. When, as here, a neutrally phrased supplemental instruction is directed at all jurors rather than just those holding a minority view, and encourages them to continue deliberations, it reduces the possibility of coercion. *See Arney*, 248 F.3d at 988.

The instruction did not state that the jury must reach a unanimous verdict or that a hung jury was unacceptable. *See Booth-El v. Nuth*, 288 F.3d 571, 582 (4th Cir.), *cert. denied*, 123 S. Ct. 384 (2002). The jurors therefore knew they would be discharged with or without a unanimous verdict. Indeed, the juror's right to continue disagreeing was included in the charge at least implicitly, if not expressly. *See* Tr. vol. VIII at 1560 (indicating that if jury did not reach

-24-

unanimous verdict, trial court would discharge jury and impose either life or life without parole sentence).  The instruction merely asked the jury to continue deliberating, which is what it would have done without the supplemental instruction, and the instruction did not impose any time restrictions on the deliberations.  Moreover, while the court indicated the consequences if the jury did not reach a unanimous verdict, the Supreme Court has upheld a similar instruction as not coercive.  *See Lowenfield*, 484 U.S. at 234, 235.

In addition, we have held that calling the jury *sua sponte* into the courtroom to inquire about their progress is not coercive.  *See United States v. Rodriguez-Mejia*, 20 F.3d 1090, 1092 (10th Cir. 1994) (holding not error, although not preferred, to give supplemental instructions before jury declares deadlock, even when jury had been deliberating only few hours).  A court may give a supplemental instruction *sua sponte* before counsel requests one, even without any indication from the jury that it is deadlocked.  *See Gilbert*, 302 F.3d at 1175; *Thomas v. Jones*, 891 F.2d 1500, 1504 (11th Cir. 1989) (trial court not coercive when it interrupted jury deliberations, advised jury it was not trying to force verdict but if jury could not agree unanimously on death verdict jury would be required to return verdict of life without parole, and then permitted jury to continue and complete deliberations).

Nor was the trial court's inquiry about the jury's numerical division per se impermissible. *See Montoya*, 65 F.3d at 412 (distinguishing direct appeal of federal criminal conviction, governed by per se rule of *Brasfield v. United States*, 272 U.S. 448 (1926), from federal collateral review of state conviction and citing cases from Fourth, Sixth, Seventh, Eighth, and Ninth Circuits); *see also Lowenfield*, 484 U.S. at 240 n.3 (citing cases); *Schaff v. Snyder*, 190 F.3d 513, 535-36 (7th Cir. 1999) (noting no Supreme Court case holds state court judge's inquiry into numerical breakdown is constitutionally prohibited); *Jiminez v. Myers*, 40 F.3d 976, 980 (9th Cir. 1993) ("[A state] trial court's neutral inquiry into the division of the jury without other circumstances suggestive of coercion does not deprive a defendant of due process."). After inquiring about the numerical division, the trial court here did not know who the hold-out juror was or which punishment the majority of jurors favored. *See Gilbert*, 302 F.3d at 1176 (trial court's inquiry into jury's numerical division without eliciting information about favored sentence not coercive); *Thompson v. Cain*, 161 F.3d 802, 810 (5th Cir. 1998) (trial court's inquiry into jury's numerical division did not render defendant's trial fundamentally unfair); *cf. Montoya*, 65 F.3d at 413 (less coercive for court to inquire about numerical division than about how each side stood). The trial court merely assessed the jury's progress, gave a neutral instruction to continue deliberations, and repeated its earlier instruction on the

consequences of the failure to reach a unanimous verdict. Under these circumstances, "the jurors could not have labored under the impression that the court was interested in what their actual decision would be." *Gilbert*, 302 F.3d at 1176.

Mr. Darks points to three other circumstances he alleges demonstrate a coerced verdict. He contends the trial court's individual voir dire in chambers, asking only whether prospective jurors could consider the death penalty as one of the punishment alternatives, indicated to prospective jurors that the court was inclined toward a death sentence. Mr. Darks points out that the questioning occurred in secret and that the trial court did not ask whether each potential juror could consider all three punishments or specifically whether the juror could consider life or life without parole. We are not persuaded the individual voir dire was coercive. The trial court neutrally questioned each juror individually and asked only whether the prospective juror could "consider the death penalty." The court did not in any way suggest a death sentence was the proper punishment.

Mr. Darks also points to the fact that the trial court *sua sponte* removed potential jurors who could not consider a death sentence, *see* Tr. vol. I at 176-77; *id.* vol. II at 296-98, but removed other jurors who indicated a preference for the death penalty only after the State or Mr. Darks moved to excuse them for cause, *see id.* vol. II at 206; *id.* vol. III at 382-84, 429. However, the trial court allowed

-27-

both parties to question all potential jurors about their beliefs and their ability to consider life and life without parole as possible punishments. One potential juror was removed after such questioning because that juror could not consider life with the possibility of parole as a punishment option. *Id.* Tr. vol. III at 428-29. The trial court did not express an opinion that death was the proper punishment. Moreover, the second stage instructions informed the jury that the court did not suggest a particular punishment, and that the jury had the duty to decide which of the three punishments to impose. O.R. at 331, 348. We presume the jury followed these instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Second, Mr. Darks asserts that the trial court's response to a note from the jury coerced a death penalty verdict. At some unknown time during deliberations, the jury sent a note to the trial court asking "Does the Life Without Parole punishment <u>Require</u> a unanimous verdict? The last paragraph on Supplemental instruction number 12 says '<u>You may</u> also return a unanimous verdict of imprisonment for life or life without parole.'" O.R. 358 (emphasis in original). The trial court answered "yes." *Id.* Mr. Darks does not explain why he believes the response to this question contributed to a coerced verdict. We think the trial court's response merely clarified the original jury instructions. At the time the court answered the question, the jury was still deliberating and the court was unaware of the jury's numerical division. While the jury's note arguably suggests

-28-

it was leaning toward a sentence of life without parole at the time it sent the note, we are not convinced the court's response to the jury's note coerced a death sentence.

Finally, Mr. Darks argues that the relatively short period of time between the trial court's giving of the supplemental instruction and the jury's verdict demonstrates coercion. There is a suggestion of coercion when a jury returns its verdict soon after receiving the supplemental instruction. *See Lowenfield*, 484 U.S. at 240. But defense counsel did not object to the division poll or supplemental instruction, further suggesting "the potential for coercion argued now was not apparent to one on the spot." *Id.* The supplemental instruction contained no coercive language and expressly indicated the jurors need not reach a unanimous verdict. *Cf. McElhiney*, 275 F.3d at 946-47 (recognizing short time for deliberations may be important in determining coercion where trial court employs faulty language in supplemental instruction). The jury was not deadlocked and the short amount of time it deliberated after hearing the supplemental instruction lends scant support to a finding of coercion, especially when the instruction did not exhort the jury to reach a unanimous verdict. It is just as likely the jury was within twenty minutes of a verdict before the trial court gave the supplemental instruction.

After viewing the supplemental instruction in light of the totality of the circumstances, we conclude it was not coercive. It did not displace the jurors' independent judgments or suggest a need for compromise or expediency. If anything, the trial court "painstakingly attempted to avoid influencing the jury to return a verdict of death." *Thomas*, 891 F.2d at 1504; *cf. Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam) (trial court's exhortation to jury that "[y]ou have got to reach a decision in this case" was coercive). The supplemental instruction therefore did not deny Mr. Darks his right to a fair trial and an impartial jury. *See Lowenfield*, 484 U.S. at 241; *see also Montoya*, 65 F.3d at 409 (requiring supplemental charge to be so coercive it unconstitutionally rendered trial fundamentally unfair). Accordingly, the district court erred in granting habeas relief on this claim.

## C. Cumulative Error

The State contends the district court erred in holding that cumulative error unconstitutionally impacted the trial court proceedings. In addition to the *Beck* and jury coercion issues discussed above, the district court noted the following six additional "serious" errors, which the OCCA had found harmless: (1) Mr. Darks' trial counsel erroneously summarized a witness's testimony during first stage closing argument; (2) Mr. Darks was held in jail for over forty-eight hours without a probable cause hearing; (3) the trial court improperly admitted at the

-30-

first stage a forged divorce decree granting child custody to Mr. Darks; (4) the trial court erroneously admitted at the first stage improper police comments made during Mr. Darks' videotaped interview; (5) prosecutorial misconduct occurred during the second stage closing arguments; and (6) the trial court improperly admitted at the second stage photographs the State used to prove victim impact. Without separating the errors into the trial's first and second stages, the district court held that the cumulative effect of these errors and the two errors upon which it had granted relief "did not have an isolated or trivial effect on [Mr. Darks'] trial." Dist. Ct. R. vol. I, doc. 75 at 76. Rather, the court determined that "in [this] case based on circumstantial evidence, those errors had a pervasive effect on the inferences to be drawn from the evidence and therefore, warrant habeas relief." *Id.*

The State contends that no Supreme Court authority recognizes "cumulative error" as a separate violation of the Constitution or as a separate ground for habeas relief. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir.) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *cert. denied*, 2003 WL 1617945 (U.S. Mar. 31. 2003) (No. 02-7467). Consequently, the rejection of a cumulative error challenge cannot be contrary to or an unreasonable application of clearly established Supreme Court precedent. *See*

-31-

28 U.S.C. § 2254(d)(1). Furthermore, the State argues habeas relief cannot be granted on cumulative errors that do not separately warrant habeas relief because each error must be assessed against the record as a whole in finding harmlessness, and harmlessness necessarily includes a finding of no cumulative error. While Mr. Darks acknowledges that no Supreme Court precedent directly addresses cumulative error, he argues, as he did before the OCCA, that the guarantees of a fair trial and due process apply to his cumulative error claim.

Supreme Court authority clearly establishes the right to a fair trial and due process. *See, e.g.*, *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) (recognizing Constitution entitles defendant to fair trial, not perfect one; harmless error focuses on trial's fairness); *Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978) (deciding cumulative effect of potentially damaging circumstances violated due process guarantee of fundamental fairness); *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974) (considering totality of prosecutorial misconduct in context of entire trial to decide if misconduct was sufficiently prejudicial to violate defendant's due process rights); *see also United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990) (en banc) (recognizing federal courts have based finding of fundamental unfairness on cumulative impact of two or greater number of errors). Because Mr. Darks raises a cumulative error claim under due process principles, we need not reach the State's argument that no

Supreme Court authority recognizes cumulative error as a separate constitutional ground for granting habeas relief.

As we have noted, Mr. Darks argued on direct appeal that the accumulation of error denied him his constitutional rights to due process and a fair trial. The OCCA rejected this argument, holding that "if individual assertions of error are rejected, then the propositions when considered collectively will not yield a different result." *Darks*, 954 P.2d at 168 (citing *Ballou v. State*, 694 P.2d 949, 952 (Okla. Crim. App. 1985)). The OCCA's rationale, however, "taken on its face, would render the cumulative error inquiry meaningless, since it indicates that cumulative error may be predicated only upon individual error already requiring reversal." *Willingham v. Mullin*, 296 F.3d 917, 935 (10th Cir. 2002), *petition for cert. filed,* (U.S. Dec. 26, 2002) (No. 02-9404) Accordingly, we review this cumulative error claim *de novo*, applying the controlling federal standards. *See id.* In so doing, we point out that the State does not assert the OCCA erred in finding the six errors. Indeed, the State does not even discuss those errors in its brief on appeal. We therefore assume without deciding that all six constituted errors.

Cumulative error analysis is an extension of harmless error, *see Rivera*, 900 F.2d at 1469, and "conduct[s] the same inquiry as for individual error," *id.* at 1470, focusing on "'the underlying fairness of the trial,'" *id*. at 1469 (quoting *Van*

*Arsdall*, 475 U.S. at 681); *see also United States v. Wood*, 207 F.3d 1222, 1237 (10th Cir. 2000). "[T]he 'cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'" *Hooper*, 314 F.3d at 1178; (quoting *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002), *petition for cert. filed,* (U.S. Feb. 25, 2003) (No. 02-9257); *see also Rivera*, 900 F.2d at 1469. As in assessing the harmlessness of individual errors, therefore, this court "evaluate[s] whether cumulative errors were harmless by determining whether a criminal defendant's substantial rights were affected." *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998).

> A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Unless an aggregate harmless determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless.

*Rivera*, 900 F.2d at 1470; *see Duckett*, 306 F.3d at 992; *Willingham*, 296 F.3d at 935. Because the OCCA addressed harmless error under an incorrect standard, we apply the harmless error standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637 (quotation omitted).

-34-

*See Herrera v. LeMaster*, 301 F.3d 1192, 1200 (10th Cir. 2002) (en banc), *cert. denied*, 123 S. Ct. 1266 (2003).

In assessing cumulative error, only first stage errors are relevant to the conviction, but all errors are relevant to the sentence. *See Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *see also Coleman v. Saffle*, 869 F.2d 1377, 1396 (10th Cir. 1989) (considering whether first stage prosecutorial misconduct errors prejudiced penalty phase). Considering the entire record, *see Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000), and the errors in aggregate, we conclude Mr. Darks' right to a fair trial was not substantially impaired at either stage of trial. Because we have concluded that no error occurred with respect to either the failure to give a lesser included offense instruction or the giving of the supplemental instruction, the only matters we consider here are the six errors found by the OCCA. *See Moore*, 153 F.3d at 1113 (cumulative error analysis "does not apply to the cumulative effect of non-errors"). Even when accumulated, we are not persuaded the errors had a sufficiently harmful effect to deny Mr. Darks a fair trial.

With respect to the first stage of trial, we conclude that the strong circumstantial evidence of Mr. Darks' guilt overcomes the cumulative impact of the four guilt stage errors. *See Hooper*, 314 F.3d at 1178 (deciding no prejudice due to extensive evidence supported finding of guilt). Each of the four errors had

-35-

minor significance. *See Alvarez*, 225 F.3d at 825 ("courts must be careful not to magnify the significance of errors which had little importance"). They did not significantly strengthen the State's case or diminish Mr. Darks' case. "No reasonable probability exists that the jury would have acquitted [Mr. Darks] absent the errors." *Hooper*, 314 F.3d at 1178. Thus, the cumulative effect of the first stage errors was harmless.

With respect to the second stage, we likewise conclude the cumulative error was not prejudicial to Mr. Darks. Substantial evidence supported the continuing threat aggravator. Moreover, during his videotaped interview, which was shown to the jury, Mr. Darks showed no remorse and instead indicated an extreme callousness about the murder. In our judgment, the cumulative impact of all six of the assumed errors is insufficient to undermine the continuing threat aggravator. Consequently, no reasonable probability exists that the jury would have imposed a sentence less than death absent these errors.

We conclude Mr. Darks was not entitled to habeas relief from his conviction or from his sentence. Accordingly, we **REVERSE** the district court's grant of habeas relief.